[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12143
_____

D.C. Docket No. 2:12-cr-00092-JES-DNF-1


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ALAN ROBERT JOHNSON,

Defendant - Appellant.


_____

No. 14-12075
_____

D.C. Docket No.  2:12-cr-00092-JES-DNF-2


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JENNIFER A. SPARKS,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(December 1, 2015)

Before MARTIN and ROSENBAUM, Circuit Judges, and COOGLER,[*] District
Judge.

ROSENBAUM, Circuit Judge:

Defendant-Appellants Alan Robert Johnson and Jennifer A. Sparks's day did

not start well for them.  They left their cell phone at a Walmart store.  But this

wasn't just any cell phone; Johnson and Sparks's phone stored hundreds of images

and videos of child pornography that they had made using Sparks's friend's four-

year-old child—and Johnson was already a registered sex offender.  So Defendants

must have felt pretty relieved when they learned that Linda Vo, an employee of the

Walmart where Defendants left their phone, had found it and that she agreed to

return it.

But Vo decided to look at the contents of the phone, which were not

password-protected, after speaking with Sparks and before actually meeting her.

Upon discovering the images of child pornography, Vo resolved not to return the

---

[*] Honorable L. Scott Coogler, United States District Judge for the Northern District of
Alabama, sitting by designation.

phone.  Instead, unbeknownst to Defendants, she arranged for it to be turned in to law enforcement.

When Vo failed to meet Sparks with the phone as the two had previously agreed, Defendants knew how to find Vo to get their phone back.  But Defendants did not return to their Walmart store and look for Vo.  Nor did they ask for Walmart's assistance in obtaining their phone, found in its store, by its employee.  They also did not file a report with Walmart or the police complaining that Vo would not return their phone, despite their requests.  Instead, they made a conscious decision to stop pursuing the phone, even though they knew how to get it back with reasonable effort.

That decision—whether because Defendants hoped that Vo would not report them if they did not continue to seek the phone or because Defendants simply thought recovery of the phone was not worth their reasonable effort—can be viewed only as a deliberate decision to abandon the phone.  Because Defendants abandoned their phone within three days of having lost it, they lack standing to challenge law enforcement's 23-day delay between recovering the phone and obtaining a search warrant to search it.

As for searches conducted within the three-day period before Defendants abandoned their interest in the phone, we find no reversible error in the district

3

court's denials of Defendants' suppression motions.   We also deny Johnson's challenges to his sentence.

## I.

Johnson and Sparks were indicted by a grand jury for possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(b), (b)(2), and 2 (Count 1), and for production of child pornography, in violation of 18 U.S.C. §§ 2251(a), (e) and 2 (Counts 2 and 3).  Both Johnson and Sparks moved to suppress evidence.

Following an evidentiary hearing, a United States magistrate judge submitted a report to the district court recommending that the district court deny the motions to suppress.[1]  After reviewing a transcript of the testimony and hearing argument before the magistrate judge, the district court held a supplemental hearing to resolve conflicting testimony proffered by six witnesses during the initial hearing before the magistrate judge.  The district court ultimately denied the motions to suppress.

Johnson and Sparks each then pled guilty to Count 2 under plea agreements that reserved each's right to appeal the denial of the motions to suppress.  Johnson was sentenced to 600 months' imprisonment after the district court applied the statutory enhancement set forth in 18 U.S.C. § 2251(e) based on Johnson's prior

---

[1] Johnson also filed a motion to suppress statements, which the court addressed at that same hearing and subsequently denied.  Johnson does not appeal its denial.

federal convictions for distribution and possession of child pornography.  Sparks was sentenced to 360 months' imprisonment.

Johnson and Sparks now appeal the denial of their motions to suppress. Additionally, Johnson appeals the application of the statutory enhancement to his sentence.

## II.[2]

### A.    The Private Search

Both Johnson's and Sparks's convictions, and this appeal, can be traced to an HTC smart phone that they mistakenly left at a Walmart store located in Cape Coral, Florida, on or about June 4, 2012.[3]  Linda Vo, a Walmart employee, found the phone.

After Sparks sent a text message that she describes as having "urgently requested" the return of the phone, Vo called the number indicated in the text message.[4]  During the ensuing conversation, Sparks made a peculiar request of Vo, asking her not to turn the phone over to customer service but instead to hold onto it until Sparks could pick it up directly from Vo.

---

[2] Where factual conflicts in the record exist, we take our facts from the district court's factual findings.  *See infra* at Section III.B.1.

[3] Sparks maintains that the phone was left at Walmart two days earlier, on June 2, 2012. The disagreement over the date on which the phone was lost does not affect our analysis.

[4] As the district court noted, what Vo did with the phone is not entirely clear because Vo was not called as a witness at the evidentiary hearings.  Vo's then-fiancé and now-husband, David Widner, did testify, and his testimony provided most of the basis for what is known about Vo's actions.

After making arrangements to return the phone, Vo looked at digital photographs stored in a photo album on the phone, apparently in an attempt to identify the woman to whom she was planning to return the phone. The phone was not password protected, so Vo was able to access the content stored on the phone. She discovered what Widner later described as "questionable" images. Vo told Widner that she had seen some "pretty weird" pictures involving a young girl who was sometimes nude. Widner decided to look at the pictures himself to determine whether the phone should be turned over to the police.

Vo showed him the images on the cell phone and told him about a video that was also stored on the phone. In the phone's photo-album application, Vo accessed a screen that displayed several smaller "thumbnail" images. Vo scrolled through the album as Widner looked on, and Widner was able to see in thumbnail format all of the images contained within the album. Vo then showed Widner a full-size image in which three prepubescent girls stood naked in the middle of a room in what Widner thought was a posed and sexually suggestive manner. Widner also testified that Vo showed him another full-size image that focused on a young girl's nude vaginal area and stomach, which was covered in a substance that appeared to be semen. After Vo finished showing Widner the images, Vo gave Widner the cell phone to take to law enforcement.

6

### B.    The Warrantless Police Search

On June 4, 2012, Widner took the phone to the Fort Myers Police Department ("FMPD").[5]    When he arrived, he first spoke with a Community Service Aide ("CSA")[6] named Cassie Coleman, who had been stationed at the front booth. Widner stated that he wanted to file a report about cell-phone images that he believed to be child pornography.  He scrolled through the entire album he had previously viewed with Vo to show Coleman the photos he thought were questionable, but as soon as he located one and handed the phone to Coleman, the phone's battery died, and the phone turned off.

Widner then charged the phone at the FMPD.  While the cell phone was recharging, CSA Sarah Gallegos and CSA trainee Amanda Janetzke introduced themselves to Widner, and Widner explained how he had come to possess the phone.

Once the cell phone was sufficiently charged, Widner scrolled through it to show Gallegos and Janetzke the images he believed constituted child pornography. In doing this, Widner scrolled through the entirety of the album in thumbnail form, pausing several times to show Gallegos and Janetzke full-size images.  Gallegos remembered some of the specific images that Widner showed her, including the

---

[5] Originally, Widner brought the phone to the Lee County Sheriff's Office in downtown Fort Myers.  That Sheriff's Office instructed him to take the phone to the FMPD.

[6] CSAs are civilians, but for purposes of its Fourth Amendment analysis, the district court treated CSAs as government officials.

7

image of the young naked female child with what appeared to be semen on her stomach. Widner also showed Gallegos a video of a young girl eating ice cream.

While Widner displayed the images to Gallegos and Janetzke, text-message notifications appeared on the screen. No CSAs or FMPD personnel opened the text-message application or read the text messages during this encounter. Gallegos called Vo about the phone, and she advised Gallegos that a woman had been sending text messages to the found phone, insisting that she needed the phone back immediately. Vo did not know the woman's last name or other identifying information.

Gallegos and Janetzke contacted Detective-Sergeant Brian O'Reilly to notify him that the cell phone that Widner had brought to the station contained images of a pornographic nature involving children. Gallegos then gave the cell phone to O'Reilly and showed him some of the images that Widner had shown her. O'Reilly viewed the images himself to verify that, in fact, child pornography was on the phone. In addition to the images that Gallegos showed O'Reilly, O'Reilly briefly looked at two videos that were stored within the same album. One of the videos was that of the girl eating ice cream, which Widner had previously viewed. Widner had not watched the second video. As for the images that O'Reilly surveyed, O'Reilly looked at only those images contained within the same album that Widner had viewed.

8

After concluding that the phone contained child pornography, O'Reilly turned the phone off and submitted it to evidence. He then contacted the Cape Coral Police Department, since, by that time, it had been established that Vo had found the phone at the Walmart located in Cape Coral, not Fort Myers. O'Reilly instructed Gallegos to prepare an offense report so that he could take the report and the cell phone to the Cape Coral Police Department.

On June 5, 2012, O'Reilly logged the cell phone out of evidence and delivered it to the Cape Coral Police Department. He informed the Cape Coral Police Department that the phone had been found at a Walmart located in Cape Coral and that it contained images of child pornography.

C.    *The Application for and Execution of the First and Second Search Warrants*

On June 7, 2012, Agent Patricia Enterline, a police officer employed by the Cape Coral Police Department who had been assigned to the Federal Bureau of Investigation's ("FBI") Innocent Images Task Force ("Task Force"), received a phone call as she was about to board a plane to attend training in another city. The call was from Sergeant Steve Barnes, the sergeant in charge of the major-crimes unit of the Cape Coral Police Department. Barnes told Enterline that she was assigned to a case involving a cell phone that may or may not contain child pornography. He also explained that the cell phone was found at a Walmart and turned in to law enforcement.

Enterline was the only Cape Coral Police Department officer assigned to the FBI Task Force. In Enterline's absence, the three other Task Force officers who might have been available to investigate the cell phone were not able to check the cell phone out of the Cape Coral Police Department evidence room.

Enterline returned from her training late Friday night, on June 8, 2012, and left for another scheduled training class located in Maryland on Sunday, June 10, 2012. She got back from that training on Saturday, June 16, 2012. On Monday, June 18, 2012, Enterline checked the cell phone out of the Cape Coral Police Department evidence room and transferred it to the FBI. For the rest of that day, Enterline was working with an Assistant United States Attorney on another case. The next day, June 19, 2012, Enterline removed the cell phone's protective case to procure the cell phone's serial number. When she did that, she found three small pieces of paper, none of which provided information regarding ownership of the cell phone. Enterline did not pursue a search warrant on June 19, 2012, because she was leaving the next day for additional training on the other side of the state.

When Enterline returned from her training on June 26, 2012, she attempted to contact O'Reilly and a state-court judge, but she was unable to reach either. On June 27, 2012, Enterline prepared an application for a search warrant and a supporting affidavit for the cell phone. To do so, Enterline did not turn on the cell phone or view any images but instead attempted to contact Vo and Widner by

10

telephone.   When she could reach neither, she called O'Reilly, who provided descriptions of the images he saw that he believed constituted child pornography.

Enterline then presented the search warrant application and supporting affidavit to a state-court judge.  The application did not attach any images.  Instead, the affidavit included O'Reilly's descriptions of images that he had viewed on the cell phone.  The state-court judge found probable cause and signed the warrant on June 27, 2012.

That same day, Enterline and her colleague Matt DeShazo, a forensic examiner, conducted a forensic examination of the phone.  Enterline determined from data stored on the cell phone that Johnson owned the phone.  Based on the information retrieved from the cell-phone search, she then obtained from the same judge a search warrant to search Johnson's home, which Johnson shared with Sparks.

Later that same day, June 27, 2012, Enterline and another law-enforcement officer went to Johnson's home to execute the residence warrant, and they encountered Johnson.  Johnson confirmed that he had lost the cell phone at Walmart. He also stated that within three days of having lost the phone, he filed an insurance claim with his phone company and received a replacement phone.  He gave the replacement to Sparks.  Additionally, by this time, Johnson had already purchased another phone for himself.

In all, 1,322 sexually explicit still images and 45 sexually explicit videos that constituted child pornography were recovered from the cell phone. Another 508 sexually explicit images and 58 sexually explicit videos constituting child pornography were found on items within Johnson's residence.

### III.

Johnson and Sparks contend that the district court's denial of their respective motions to suppress should be reversed. They both argue that the district court clearly erred by finding that the warrantless search of the cell phone by the FMPD did not exceed the scope of the search conducted by Vo and Widner. They also assert that Enterline's delay in obtaining the search warrant unreasonably interfered with their possessory interests in the cell phone. Additionally, Sparks contends that the district court should have granted her motion to suppress because Enterline did not attach actual images to the search-warrant affidavit and instead relied upon O'Reilly's descriptions. We do not find merit in any of Johnson's and Sparks's arguments.

### A.    *Standard of Review*

The review of the denial of a motion to suppress presents a mixed question of law and fact. *See United States v. Mathis*, 767 F.3d 1264, 1274-75 (11th Cir. 2014); *United States v. Laist*, 702 F.3d 608, 612 (11th Cir. 2012). We review the district court's findings of fact for clear error and it rulings of law and application

of the law to the facts *de novo*. *See Mathis*, 767 F.3d at 1274-75; *Laist*, 702 F.3d at 612. With regard to the district court's factual findings, only if a review of the record leaves a "definite and firm conviction that a mistake" has been made do we conclude that a district court clearly erred. *United States v. White*, 335 F.3d 1314, 1319 (11th Cir. 2003) (citation and quotation marks omitted). Because the district court personally observes the testimony and is in the best position to evaluate witnesses' credibility, "where . . . testimonies are in direct conflict . . . , a 'trial judge's . . . choice of whom to believe is conclusive on the appellate court unless the judge credits *exceedingly* improbable testimony.'" *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (quoting *United States v. Cardona-Rivera*, 904 F.2d 1149, 1152 (7th Cir. 1990)).

In applying the law to the facts while reviewing a motion to suppress, we construe the facts in the light most favorable to the party that prevailed in the district court—in this case, the government. *See Mathis*, 767 F.3d at 1274-75; *Laist*, 702 F.3d at 612. We may affirm the district court's judgment on any basis supported by the record. *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006). And even if the district court erred in denying a motion to suppress, we must uphold the conviction unless the error was not harmless beyond a reasonable doubt. *United States v. Alexander*, 835 F.2d 1406, 1411 (11th Cir. 1988); *see also Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967).

13

### B.   The Private-Search Doctrine

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  The protection the Fourth Amendment affords, however, extends to governmental action only; "it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656 (1984) (quoting *Walter v. United States*, 447 U.S. 649, 662, 100 S. Ct. 2395, 2404 (1980) (Blackmun, J., dissenting)).  So once an individual's expectation of privacy in particular information has been frustrated by a private individual, the Fourth Amendment does not prohibit law enforcement's subsequent use of that information, even if obtained without a warrant. *Id.* at 116, 104 S. Ct. at 1656; *see id.* at 117, 104 S. Ct. at 1658-59.  As a result, a warrantless law-enforcement search conducted after a private search violates the Fourth Amendment only to the extent to which it is broader than the scope of the previously occurring private search. *Id.* at 115, 104 S. Ct. at 1656; *see also United States v. Garcia-Bercovich*, 582 F.3d 1234, 1238 (11th Cir. 2009).

Johnson and Sparks maintain that the warrantless search of the cell phone conducted by O'Reilly violated their Fourth Amendment rights.  Specifically, they

argue that the government failed to establish that the images observed by O'Reilly at the FMPD, which formed the basis for and led to the issuance of the search warrants, were within the scope of the prior search that Vo and Widner conducted. As a result, Johnson and Sparks contend, all of the evidence that was obtained by executing the warrants should be suppressed.[7] This argument has two components: (1) the district court clearly erred when it determined, as a matter of fact, that the scope of the private search included all images contained within one digital photo album stored in the photo application of the cell phone and when it found that O'Reilly viewed content stored only within that same album; and (2) the district court erred as a matter of law by concluding that O'Reilly's search did not exceed the scope of the private search when O'Reilly watched a video not viewed by Widner, which was stored within the same album that Widner had scrolled through.

## 1.

Regarding the alleged error of fact, the district court found that Widner had, on at least three separate occasions, viewed the entirety of one photo album stored on the phone. First, Widner initially saw all of the images contained in the single photo album—at least in thumbnail format—when Widner scrolled through the

---

[7] "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 3385 (1984) (citations omitted).

15

whole album while looking at the cell-phone images with Vo at Walmart. Widner scrolled through the entirety of the same photo album a second time before handing the phone over to Coleman. And third, Widner scrolled through and therefore viewed all of the images in the album when he looked at them with Gallegos and Janetzke.

Widner's testimony supported these findings and demonstrated that Widner was able to discern the images of the photos in the album by reviewing them in thumbnail format. For example, Widner testified that he "saw the little thumbnails" and that his wife, using the thumbnails of the images, showed him "where [the potential images of child pornography] start[ed] and . . . where they start[ed] getting worse." Widner also explained that, while at the FMPD, he searched for the images he had previously viewed by looking at the thumbnails. In addition, Widner described the album as containing a "sequence [of pictures], like taken back to back," and stated that he "could see the images as they passed."

As for the videos, although Widner testified that he did not view any videos stored within the album, the court credited Gallegos's testimony that Widner had showed her a video of a girl eating ice cream. In explaining why, the court stated that after considering the witnesses' demeanor, their testimony, and the factors listed in Basic Instruction 5 of the Eleventh Circuit Pattern Criminal Jury Instructions, it did "not find that Widner [was] not telling the truth as he

16

remember[ed] it, but [did] find that he [was] inaccurate" regarding the viewing of the video. We cannot say that the testimony that the district court chose to credit was "exceedingly improbable," *Ramirez-Chilel*, 289 F.3d at 749, or otherwise clearly erroneous.

With regard to the scope of the search performed by O'Reilly, the district court concluded that O'Reilly observed images contained within the same photo album that Widner had already viewed in its entirety. Nothing in the record contradicts this conclusion or even casts aspersions on it. To the contrary, O'Reilly specifically testified that he looked at only those images contained in a single photo album, and his description of the thumbnails of the photos contained in that album matched the contents of the album that Widner had viewed. The district court's factual findings are amply supported by the record, and we find no clear error in any of the district court's challenged factual conclusions.

## 2.

Next, we consider Johnson and Sparks's second argument—that the district court erred as a matter of law by concluding that O'Reilly's search did not exceed the scope of the private search. To the extent that O'Reilly viewed the second video, which was stored within the same album that Widner had scrolled through but which Widner did not view, we agree with Johnson and Sparks that O'Reilly exceeded the scope of Widner's private search. But we nevertheless conclude that

17

the error had no effect on the state court's determination of probable cause supporting the issuance of the two search warrants. We therefore affirm the district court's denial of Defendants' motions to suppress.

The district court relied on *United States v. Simpson*, 904 F.2d 607 (11th Cir. 1990), in holding that O'Reilly's viewing of the second video did not exceed the scope of Widner's search, even though Widner had not reviewed that particular video. Though we find *Simpson* to be analogous to the facts here as they regard O'Reilly's review of the photos and the video that Widner had previously seen, we conclude that *Simpson* cannot justify O'Reilly's viewing of the second video.

In *Simpson*, FedEx employees opened a package that was missing an address label to try to determine a destination for the package. *Id.* at 610. A company security officer viewed four videotapes from the package and concluded that they contained sexually explicit material in which some of the actors appeared to be minors. *See id.* An Assistant United States Attorney and an FBI agent later viewed the same four videotapes. *See id.* We held that the government officials "did not exceed the scope of the prior private searches for Fourth Amendment purposes simply because they took more time and were more thorough than the Federal Express agents." *Id.* at 610.

We agree that under *Simpson*, O'Reilly's review of the photos and the video that Widner watched did not violate the Fourth Amendment. Though O'Reilly

18

may have looked at some of the photos and the video more closely than did Widner, as with the videotapes in *Simpson*, the private party's earlier viewing of the same images and video insulated law enforcement's later, more thorough review of them from transgressing the Fourth Amendment.

But with respect to the second video, which Widner never watched, O'Reilly's review exceeded—not replicated—the breadth of the private search. Nothing in *Simpson* provides a safe harbor for a governmental search of materials beyond the scope of a private search.

We also have serious doubts that approving of O'Reilly's viewing of the second video when no private party had first watched it would be consistent with the reasoning in *Riley v. California*, ___ U.S. ___, 134 S. Ct. 2473, 2489-90 (2014). In *Riley*, the Supreme Court held that law enforcement must obtain a search warrant to search a cell phone seized incident to arrest, unless exigent circumstances apply. *Id.* at 2494-95. In reaching this conclusion, the Court emphasized that cell phones "hold for many Americans 'the privacies of life.'" *Id.* (citation omitted). It further observed the tremendous storage capacity of cell phones and the broad range of types of information that cell phones generally contain, suggesting that a search warrant for a cell phone must specify what part or parts of the information contained on it may be searched. *Id.* at 2489. While Widner's private search of the cell phone might have removed certain information

19

from the Fourth Amendment's protections, it did not expose every part of the information contained in the cell phone. Here, no search warrant was obtained, and no exception to the search-warrant requirement excused O'Reilly's viewing of the second video.

**3.**

Nevertheless, we find no reversible error in the denial of the motions to suppress. The government subsequently obtained a valid search warrant to search the cell phone, based upon an affidavit that did not include any reference to O'Reilly's review of the second video.[8] Instead, the affidavit described only the photos and the first video, which Widner had previously reviewed:

> The images begin with a naked adult white male and female and several pictures of a white male penis. The pictures progress into a series of images and a video of a white female toddler eating an ice cream cone. Sgt. O'Reilly said that he then observed a series of pictures of what appeared to be the same toddler female on the beach in her bathing suit, as the pictures progress the images zoom in on the toddler's buttocks making it the focal point of the image. The next series of images also appear to be the same toddler child asleep wearing a pair of panties and a shirt, as the pictures progress the images zoom into the vaginal area of the toddler's panties as she is sleeping and her legs are spread apart.

---

[8] The search warrant was obtained on June 27, 2012. By that time, Johnson and Sparks had long since abandoned the cell phone. *See infra* at Section III.C.2. As a result, they lacked standing to contest the June 27, 2012, search warrant. *United States v. Winchester*, 916 F.2d 601, 603 (11th Cir. 1990) (standing to challenge a search is measured at the time of the search). But even if Johnson and Sparks enjoyed standing to contest the search warrant issued on June 27, 2012, their challenges could not have succeeded for the reasons set forth above.

20

> Sgt. O'Reilly then described images of a naked female toddler sitting on a toilet, naked toddler males standing beside each other exposing their genitals and an image of what appeared to be a naked prepubescent female lying down. The image depicts the child from the waist down and focuses on her vaginal and stomach area. Sgt. O'Reilly describes a substance on the stomach of the child in the image that appears to be semen.

This affidavit established probable cause that the cell phone contained evidence of criminal activity.

As we have explained, "[p]robable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). Judges must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983). "Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." *United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir. 1986) (citation omitted). When determining whether a search-warrant affidavit established probable cause, due weight is given to

21

inferences drawn from the facts by the issuing judge and local law-enforcement officers. *Mathis*, 767 F.3d at 1275 (citation omitted).

The affidavit supporting the search of the phone allowed the court to find probable cause. It described photographs of naked men, women, and children, including close-ups of private body parts, and culminated in a description of a photo that focused on a young child's naked vagina and stomach, covered in a fluid that appeared to be semen. This was more than enough to allow a judge, relying on common sense, to determine that it was fairly probable that the phone contained evidence of images depicting a sexual performance by a child, in violation of Fla. Stat. § 827.071.[9]

Nor do we agree with Sparks that the affidavit contained insufficient probable cause since it did not attach copies of the photographs that it described. An issuing judge need not personally view photographs or images which are alleged to be contraband if a reasonably specific affidavit describing the contents

_____

[9] Fla Stat. § 827.071(5)(a) provides, "It is unlawful for any person to knowingly possess, control, or intentionally view a[n] . . . image . . . which, in whole or in part, he or she knows to include any sexual conduct by a child." In relevant part, "sexual conduct" is defined as

> actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast, with the intent to arouse or gratify the sexual desire of either party; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed.

Fla. Stat. § 827.071(1)(h)

22

can provide an adequate basis to establish probable cause. *See New York v. P.J. Video, Inc.*, 475 U.S. 868, 873-74, 106 S. Ct. 1610, 1614 (1986); *United States v. Lowe*, 516 F.3d 580, 586 (7th Cir. 2008); *United States v. Chrobak*, 289 F.3d 1043, 1045 (8th Cir. 2002). The descriptions here were not vague conclusions that the phone contained images of child pornography; they objectively and specifically stated the contents of the photos, and Enterline swore to these descriptions under oath.

Indeed, Sparks does not challenge the descriptions as inaccurate; she complains instead that the judge who issued the warrant did not personally view the photos. But the affidavit's descriptions, in and of themselves, established the child-pornographic nature of the images. Because the descriptions independently demonstrated probable cause for possession of child pornography, the judge was not required to actually look at the photos.

C.    *The Effect of a Delay in Obtaining a Search Warrant on a Possessory Interest*

Johnson and Sparks also challenge the district court's conclusion that Enterline's delay in obtaining the initial search warrant for the cell phone did not unreasonably interfere with Johnson's and Sparks's possessory interests in the phone.

23

Johnson and Sparks concede the legality of the initial seizure[10] of the cell phone by the FMPD after it had viewed images on the phone, even though the phone was seized without a warrant. As we have discussed, the phone carried images of child pornography, which constituted contraband. "[I]t is constitutionally reasonable for law enforcement officials to seize 'effects' . . . without a warrant [when] probable cause [exists] to believe they contain contraband." *Jacobsen*, 466 U.S. at 121-22, 104 S. Ct. at 1660.

But "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable searches.'" *Id.* at 124, 104 S. Ct. at 1662. So if, after seizing an item, law enforcement unreasonably delays obtaining a warrant to search the item, a reasonable seizure can become unreasonable. *United States v. Mitchell*, 565 F.3d 1347, 1350 (11th Cir. 2009). Usually, "the reasonableness determination will reflect a careful balancing of governmental and private interests." *Soldal v. Cook Cty.*, 506 U.S. 56, 71, 113 S. Ct. 538, 549 (1992) (quotation marks and citation omitted); *see Illinois v. McArthur*, 531 U.S. 326, 331, 121 S. Ct. 946, 950 (2001)

---

[10] Where "governmental authorities exert dominion and control over [an effect] for their own purposes . . . a 'seizure' [has occurred], though not necessarily an unreasonable one." *Jacobsen*, 466 U.S. at 120 n.18, 104 S. Ct. at 1660 n.18. Property need not be seized from the immediate custody and control of the owner to qualify as a "seizure." *United States v. Place*, 462 U.S. 696, 705, 103 S. Ct. 2637, 2643 (1983).

24

("[R]ather than employing a *per se* rule of unreasonableness, [courts should] balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable.").

Here, the district court employed this balancing approach and concluded that the delay in obtaining the search warrant for the cell phone was reasonable. First, the district court opined that "[l]aw enforcement was not particularly diligent in pursuing its investigation of the images on the cell phone" because attending training is not typically a sufficient justification for a three-week delay in obtaining a warrant and because the "search warrant application was not complex or time-consuming."

But it weighed these determinations against its finding that Johnson's and Sparks's possessory interests in the phone were "greatly diminished" for a number of reasons: (1) the phone had been lost and retrieved by a private person; (2) the phone was not password protected; (3) two private citizens and several law-enforcement officials had already viewed images contained on the phone; (4) from that point forward, neither defendant would have been able to retrieve the phone because it contained contraband and was itself derivative contraband; and (5) the defendants replaced the cell phone within a couple of days. Based on the weighing of these factors, the court concluded that the government's legitimate interest in

holding the cell phone that it had already determined contained contraband outweighed Johnson's and Sparks's interests in the phone.

Johnson and Sparks contend that the district court erred in finding that the 23-day delay between law enforcement's seizure of the phone and its obtaining of a search warrant was not unreasonable. In support, they rely on *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009)—where we held that a 21-day delay was unreasonable—and attempt to distinguish *United States v. Laist*, 702 F.3d 608 (11th Cir. 2012)—where we held that a 25-day delay[11] was reasonable.

We do not reach the issue of whether the 23-day period between the seizure of the phone on June 4 and the obtaining of a search warrant for it on June 27 was unreasonable. Johnson and Sparks lost standing to contest the length of the 23-day delay because they abandoned their possessory interests in the phone by, at the latest, June 7, 2012.[12] And the, at most, three-day period during which they had standing to contest the length of the delay was not unreasonable under the circumstances of this case.

---

[11] In actuality, the delay in *Laist* lasted from March 12 until April 7—a delay of 26 days (or 27 if both the first and last days are counted).

[12] Johnson stated that he replaced the seized phone three days after its disappearance. Johnson and Sparks allege that Sparks lost the phone on June 2, though Widner suggested that the phone was found on June 4. If Johnson replaced the phone on June 5, at most, only a one-day period elapsed between the FMPD's seizure of the phone and Johnson's and Sparks's abandonment of the phone.

**1.**

Article III of the Constitution extends the jurisdiction of federal courts to "Cases" and "Controversies" only. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559, 112 S. Ct. 2130, 2136 (1992) (citation omitted). Among other requirements, the case-or-controversy restriction demands that litigants before the court have standing to pursue the claims they press. *See id.* at 559-60, 112 S. Ct. at 2136. At an "irreducible constitutional minimum," standing requires a showing of injury in fact, causation, and redressability. *See CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269 (11th Cir. 2006) (citation and quotation marks omitted). Here, Defendants can show no injury inflicted by the delay between June 7, when, at the latest, they abandoned their cell phone, and June 27, when law enforcement obtained a search warrant for the abandoned phone.

Law enforcement must not unreasonably delay in obtaining a search warrant after seizing an item to be searched. *See United States v. Mitchell*, 565 F.3d 1347, 1352 (11th Cir. 2009). We demand expediency in obtaining a search warrant to search seized evidence in order to avoid interfering with a continuing possessory interest for longer than reasonably necessary, in case the search reveals no evidence (or permissibly segregable evidence) of a crime and the item has no independent evidentiary value and is not otherwise forfeitable. *See id.* Under those circumstances, the searched item must be returned promptly so the person

27

with the possessory interest can continue to enjoy that interest.  *Id.*  As we have explained, "In the ordinary case, the sooner the warrant issues, the sooner the property owner's possessory rights can be restored if the search reveals nothing incriminating."[13]  *Id.*

But if the person from whom the item was seized lacks a cognizable possessory interest in the item, that person's Fourth Amendment rights are not violated by even a lengthy period between seizure and the procurement of a warrant.  That is so because any delay—no matter the length—cannot interfere with possessory rights that do not exist.  And, as Chief Justice Burger has explained, "[a] seizure affects only the person's possessory interests."  *Segura v. United States*, 468 U.S. 796, 806, 104 S. Ct. 3380, 3386 (1984) (Burger, J., non-majority section of majority opinion).

The import of this observation is that a person without a possessory interest in a seized item lacks standing to object to the length of the period between the seizure and the search because the length of the seizure cannot inflict injury on that person.[14]  And a person must have standing, of course, for a court to have

---

[13] Diligently seeking a warrant also allows the judiciary to promptly evaluate and correct seizures that were improper from the outset.  *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012).  Here, however, the lawfulness of the initial seizure is beyond dispute.

[14] We have described the considerations involved in evaluating standing to object to a search—as opposed to standing to object solely to the length of a seizure—slightly differently.  *See United States v. Hastamorir*, 881 F.2d 1551, 1559-60 (11th Cir. 1989).  In *Hastamorir*, we explained that to have standing to challenge a search, a person must "maintain[] a legitimate expectation of privacy in the object of the search."  *Id.* at 1559.  The answer to that inquiry, in

28

jurisdiction over the delay issue.  *See Kelly v. Harris*, 331 F.3d 817, 819 (11th Cir. 2003) (explaining that the standing requirement must be fulfilled in order for a federal court to have jurisdiction).  Indeed, federal courts are "obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking," and the issue may not be waived or forfeited.  *Bochese v. Town v. Town of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir. 2005) (citation and quotation marks omitted); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31, 110 S. Ct. 596, 607 (1990) (citation omitted) ("Although neither side raises the issue [of standing] here, we are required to address the issue even if the courts below have not passed on it, . . . and even if the parties fail to raise the issue before us.  The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'").

Here, Defendants lack standing to contest the period of delay between June 7 and the obtaining of the search warrant on June 27 because they abandoned any possessory interests they once had in the seized cell phone by, at the latest, June 7.  For this reason, we do not have jurisdiction over Defendants' claim that this delay violated their Fourth Amendment rights.

---

turn, requires two sub-inquiries:   (1) whether the person "has manifested 'a subjective expectation of privacy in the object of the challenged search[,]'" and (2) whether society is willing to recognize the person's expectation of privacy as legitimate.  *Id.* (citation omitted).  The issue of abandonment arises under the first inquiry.  *Id.*  Where abandonment occurs, we do not reach the second inquiry.  *Id.*

**2.**

Fourth Amendment claims do not lie when the defendant has abandoned the

searched property.[15]  *See United States v. Ramos*, 12 F.3d 1019, 1024 (11th Cir.

---

[15] To the extent that the Dissent suggests that abandonment was never at issue in this case, *see* Dissent at 52 n.1 and 54 n.2, we respectfully disagree.  First, the Government did, in fact, raise abandonment in the district court in response to Defendants' motions to suppress.  *See* Government's Response to Defendant's Motion to Suppress, ECF No. 44, at 8 (emphasis added) ("The cellular phone had been previously lost, left behind, or ***abandoned*** by the defendant at a shopping center. . . .  The police did not deprive the owner, the defendant, of his possessory interest in his phone.  Since the defendant lost or ***abandoned*** his phone, and he did not report its loss to the police as to alert the police to his identity, any delay in obtaining a search warrant did not constitute a significant interference with the defendant's possessory interest.") (emphasis added); *see also* Transcript of Suppression Hearing, ECF No. 62 at 240 (government arguing, "The cell phone had been previously lost or left behind at a store, and subsequently it was ***abandoned***") (emphasis added); *id.* at 249 (defense counsel responding, "Now, their argument as far as—they're wrong about it, but ***their argument as far as the potential that it might have been abandoned is relevant***, although incorrect . . . .") (emphasis added) & 254 (defense counsel arguing, ***"[O]n this abandoned issue that keeps—that's been quoted around all day*** . . . .) (emphasis added); *id.* at 253 (court asking defense counsel, "[A]ren't you establishing a pretty high burden on them to—on a piece of ***abandoned*** property?") (emphasis added).  Second, abandonment results in a lack of standing because a person has no possessory interest in—and therefore no injury resulting from the seizure of—an item that she has abandoned.  Defendants' possessory interest in the recovered cell phone has always been at the center of Defendants' claim that the 23-day delay violated their Fourth Amendment rights, *see*, *e.g.*, Opinion and Order, ECF No. 97 ("Defendants' possessory interest in the cell phone was, as the Report and Recommendation found, 'greatly diminished.'"); Testimony of Classie Coleman, ECF No. 62 at 57-58 ("Q:  "And no one contacted the Police Department, that you're aware of, looking for the phone?"  A:  "Not to my knowledge."  Q:  "Or reporting it lost or stolen?"  A:  "Not to my knowledge, no.").  And, to show their continuing possessory interest in the phone, defendants have not been shy about describing efforts they undertook to recover the phone after they lost it.  *See, e.g.*, Sparks's Opening Br. at 8 (noting that Sparks returned to Walmart to find her phone after she realized that it had been lost; Walmart reported not having yet found the phone; Sparks sent text messages to the phone "urgently request[ing]" its return; Sparks asked Vo not to give the phone to Walmart's customer service but instead to return it personally to Sparks); *id*. at 39 (arguing, "Although the cellphone was initially lost, the defendant promptly communicated with the finder of the telephone to arrange for its immediate return.").  Third, even if the issue of abandonment were wholly unrelated to the issue of possessory interest and the issue of abandonment had never been mentioned in this case previously, we would still have an

30

1994); *United States v. O'Bryant*, 775 F.2d 1528, 1534 (11th Cir. 1985).  As our predecessor Court has explained, "[I]t is settled law that one has no standing to complain of a search or seizure of property he has voluntarily abandoned." *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973) (en banc).[16]

We assess objectively whether abandonment has occurred, based primarily on the prior possessor's intent, as discerned from statements, acts, and other facts. *Id.*  As we have said, "All relevant circumstances existing at the time of the alleged abandonment should be considered. Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary."  *Id.* (citation omitted).  In making this inquiry, we have emphasized that the issue of abandonment for Fourth Amendment standing purposes is not abandonment in the "strict property-right sense."  *United States v. Edwards*, 441 F.2d 749, 753 (5th Cir. 1971).    Rather, we use a "common sen[s]e approach" in evaluating abandonment. *Id.* The critical inquiry when determining whether an abandonment has occurred is "whether the person prejudiced . . . voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question." *Ramos*, 12 F.3d at 1022 (emphasis and citation omitted).

---

obligation to consider whether the record showed abandonment because where abandonment occurs, we lack jurisdiction.

[16] Pursuant to *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

Applying this doctrine, we have determined, for example, that an individual who ditches property during a chase with law enforcement abandons that property and lacks standing to challenge the seizure of it. *See, e.g., United States v. Tinoco*, 304 F.3d 1088, 1117 (11th Cir. 2002); *United States v. Edwards*, 441 F.2d 749, 751 (5th Cir. 1971). We have similarly concluded that a person who makes a decision to leave his property containing contraband when law enforcement approaches or seeks to examine the property likewise abandons the property and loses standing to challenge its seizure. *See, e.g.*, *United States v. McKennon*, 814 F.2d 1539, 1545-46 (11th Cir. 1987).

Indeed, we have found abandonment and consequently no standing even when a defendant chose to leave his property only because his life would have been endangered had he not done so. In *United States v. Edwards*, 644 F.2d 1 (5th Cir. Unit B 1981), the defendant was onboard a vessel called the *Lady Barbara*. A distress call was made from the vessel, stating that the boat was taking on water and sinking. *Id.* at 1. In response, both the Coast Guard and the Florida Marine Patrol dispatched rescue vessels. *Id*. at 1-2. The Coast Guard reached the *Lady Barbara* first, and its occupants, including the defendant, left the *Lady Barbara* and were taken by the Coast Guard to shore. *Id.* at 1. In the meantime, the Marine Patrol reached the empty ship and boarded it to find out whether anyone was onboard and to ascertain whether the ship carried contraband. *Id.* at 2. The Marine

32

Patrol discovered numerous bales of marijuana, which the Coast Guard later seized. *Id.* We held that the defendant lacked standing to challenge the seizure because he "called for aid, accepted aid from the Coast Guard, and voluntarily abandoned" the ship. *Id.*

Johnson and Sparks made their decision to abandon their cell phone under far less onerous circumstances. Law enforcement was not chasing them, nor were their lives at risk when they decided to abandon their cell phone. Instead, knowing who had their cell phone and where she could be found through minimal effort, Johnson and Sparks made a voluntary and calculated decision over a period of three days to cease all efforts to reclaim their phone.

First, we affirm that Johnson and Sparks initially maintained a possessory interest in the cell phone when it was lost. After Sparks noticed that she had left the phone at Walmart, she returned to the store to retrieve it but was unable to locate it. Sparks then contacted Vo and made arrangements to pick up the phone from Vo at Vo's workplace in Walmart. So far, so good.

But while Johnson and Sparks were initially eager to retrieve the cell phone, notably, Sparks instructed Vo not to leave the phone with customer service for Sparks to retrieve, suggesting that she did not want the phone back at all expenses. And when Vo failed to appear at the Walmart with the phone, as Sparks and Vo had arranged, Johnson and Sparks did a strange thing: though they knew precisely

33

who had the phone and where to find her, they made no attempts to locate Vo at the Walmart where they knew she worked. They similarly did not ask anyone at Walmart for assistance in obtaining the phone's return from Vo. Nor did they complain to Walmart that a Walmart employee had found their phone at Walmart and refused to return it. They also chose not to file a report with the police complaining about Vo's failure to give them back their phone, though they knew where Vo could be found. In fact, no evidence exists that Johnson or Sparks ever even sent another text message to the phone after June 4, 2012, in an attempt to retrieve it. *See* Report and Recommendation of the Magistrate Judge (ECF No. 64) at 33 ("Other than a text or texts reported by Vo and Widner, there was no other evidence that Johnson or Sparks made concerted attempts to obtain the cell phone such as contacting law enforcement to report that it was lost.").

This decision to stop pursuing the phone, in the face of reasonable alternatives available to obtain the return of the phone, when Johnson and Sparks knew where it was and how to get it back, stands in stark contrast to their urgent efforts to retrieve the phone in the period immediately after the phone was lost. Instead, this decision is consistent with the earlier instruction that Vo not leave the phone with customer service (which might prove too risky from a criminal-liability standpoint) and betrays the intent to abandon the phone. In other words, Johnson and Sparks made a conscious choice to allow a complete stranger (Vo) to keep

34

their phone and everything on it—without so much as a password to protect the phone's contents—rather than make reasonable further efforts to obtain its return, even though they knew who had the phone and where she was.  Whether they did so to try to avoid provoking Vo into taking the phone to law enforcement or simply because they decided that retrieval of the phone was not worth their effort, Johnson's and Sparks's intent to allow Vo to keep the phone is clear on this record.

Besides Johnson's and Sparks's complete abandonment of their efforts to obtain the phone after Vo did not appear at the designated time and place, Johnson and Sparks engaged in affirmative acts further demonstrating their intent to abandon the phone.  Within a few days of losing the phone in question, Johnson purchased an upgraded phone for himself, filed an insurance claim for the lost phone, and obtained and provided a replacement phone to Sparks.  The replacement phone that Johnson gave Sparks was the same model as the seized phone.

Under the facts in this case, Johnson's and Sparks's replacement of the phone further signified the finality of their earlier calculated decision to abandon the seized phone and cease seeking its return from the known finder.  Indeed, even had Vo decided to keep the phone for herself, the only reasonable conclusion from this record is that Johnson and Sparks had no intention to do anything further to recover it.  And if a person's decision to leave a sinking ship to save his own life

can be viewed as abandonment, *see Edwards*, 644 F.2d 1, we cannot see how a considered and voluntary choice over a three-day period to allow a total stranger to keep a phone containing personal information does not constitute abandonment, when Johnson and Sparks easily could have instead chosen to retrieve the phone with minimal, or at most, reasonable effort.

To be clear, we do not suggest a Fourth Amendment jurisprudence of "finders keepers; losers weepers." Loss is not the same thing as abandonment. And loss alone cannot support a finding of abandonment. Nor does the filing of a claim for a lost item and the replacement of that item with the resulting insurance money, in and of itself, demonstrate an intent to abandon. Instead, we must view all of the facts and consider the totality of the circumstances to determine whether an intent to abandon may objectively be discerned.

Where, as here, the purchase of a replacement phone follows the ceasing of efforts to recover the original phone despite knowledge of how to obtain the return of the original phone through reasonable efforts, those actions provide further confirmation of a deliberate decision to abandon the original phone. Nor, under these circumstances, can Johnson and Sparks's initial efforts at recovering the phone insulate them forever from a finding of abandonment when their later actions leave no other reasonable conclusion to be drawn.

In this regard, we respectfully disagree with the Dissent that Johnson and Sparks's efforts to recover the phone in this case were analogous to the efforts of the defendant in *Ramos*, who we held not to have abandoned the searched property. *See* Dissent at 57. In *Ramos*, the defendant had leased a room, but his lease expired at 10 a.m., and another client was scheduled to move in at 2 p.m. that same day. *Ramos*, 12 F.3d at 1021. A cleaning-services company was hired to clean the unit to prepare it for the next tenant. *Id.* While cleaning the apartment, the housekeepers noticed that the defendant had still not moved out. *Id.* They packed the defendant's personal effects into garbage bags. *Id.* In the process, the housekeepers found two dollar bills, each of which had a white powdery substance on it. *Id.* They also found a locked briefcase. *Id.* Peering through the side of the briefcase that did not contain the lock, the housekeepers could see pieces of napkins wrapped by rubberbands. *Id.* The cleaning company notified law enforcement. *Id.* When the police arrived, they opened the briefcase and field-tested a powdery substance located in one of the bags within the briefcase. *Id.* at 1021-22. It tested positive for cocaine. *Id.* The police then relocked the briefcase and obtained a search warrant for the purpose of expanding the search of the defendant's unit.

We held that the defendant had not abandoned his interest in the rental unit and the briefcase. In reaching this conclusion, we relied on the following facts: the

defendant had retained the key to the unit, *id.* at 1024; prior practice dictated that the holdover lessee's personal effects would be packed and held until the holdover lessee could be located, *id.* at 1025; and, significantly, the defendant had made a telephone call to the management's office, presumably to arrange to retrieve his property, the day after he had been scheduled to vacate the unit, *id.* at 1022, 1026.

*Ramos* is readily distinguishable from Johnson and Sparks's case. First, Ramos kept a key to the unit where his property was stored. Second, the search in Ramos's case occurred on the same day and within hours of when Ramos supposedly abandoned the searched property. And crucially, Ramos called the management company in an effort to recover his property within 24 hours of when he allegedly abandoned it. By that time, of course, the search had already occurred.

In contrast, here, after the initial failed effort to obtain the phone from Vo, which occurred in the first three days after the phone was lost, Johnson and Sparks made an affirmative decision to allow Vo to keep the phone, though they knew she had it and where to find her. Then they replaced the phone and went on with their lives, without another action evidencing even another thought about the lost phone. Indeed, at least twenty days passed between Defendants' cessation of efforts to recover the phone and law enforcement's search of the phone. During that time, Defendants engaged in not a single effort of any type to recover their phone from

38

Vo, despite the fact that they knew she had it and where she worked. For these reasons, *Ramos* is not helpful to Defendants.

We also must say a few words about the Dissent's suggestion that our decision here today puts us in conflict with other Circuits. *See* Dissent at 58 n.4 ("Other Circuits have found in cases like this one, where there was no verbal denial of an interest in the property or clear physical relinquishment of it (such as by throwing the property away, unconditionally giving it to another person, or dropping it and running away from it), that a person had <u>not</u> abandoned the property."). We respectfully disagree.

None of the cases cited in footnote 4 of the Dissent involved facts similar to those at issue in our case. In *United States v. Infante-Ruiz*, 13 F.3d 498 (1st Cir. 1994), for example, the court held that the defendant's decision to store items "inside a closed briefcase inside a [friend's] locked car trunk" did not reveal a "willingness . . . to 'expose' such items to the public," and "nothing . . . indicated that [the defendant] had abandoned the briefcase, relinquished authority over it, or left it open to 'public inspection and consumption.'" *Id.* at 501-02. Unlike in *Infante-Ruiz*, in our case, Johnson and Sparks did not leave their subsequently searched item with a trusted friend; they left it with a total stranger, despite the fact that it was not password-protected and despite knowing how to retrieve the phone.

*United States v. Scrivner*, 680 F.2d 1099 (5th Cir. 1982), is no more relevant. There, the court concluded that the record could not support a finding of abandonment where the officer searched two loaded trucks leased by the defendant, which were found on or in warehouse premises also leased by the defendant, merely because the trucks were unlocked and the ignition keys were inside. *Id.* at 1100. Johnson and Sparks's case is not similar to the situation in *Scrivner*; law enforcement did not recover the searched cell phone from Defendants' property.

Next, the Dissent cites *United States v. Basinksi*, 226 F.3d 829 (7th Cir. 2000). In *Basinski*, the defendant entrusted a locked briefcase to a "life long friend" so that the friend could hide it on the friend's private property, in a locked barn, surrounded by a locked gate, in a remote part of Wisconsin, which the friend visited only infrequently. When the defendant learned that the FBI had tapped his phone, he instructed the friend to burn and destroy the briefcase. The friend agreed and told the defendant that he had burned the briefcase. In fact, however, the friend did not burn the briefcase but instead turned it over to the FBI, who searched the briefcase without a warrant. The court held that the defendant had not abandoned his property interests in the briefcase. As the court explained, "By ordering [the friend] to destroy the briefcase, [the defendant] did not invite all the world to rummage through the briefcase at will . . . . Rather, his command

40

manifested a desire that nobody possess or examine the contents of the briefcase. And even after he gave this order, he continued to manifest a desire to exclude others from seeing its contents." *Id.* at 838.  Johnson and Sparks did just the opposite of the *Basinski* defendant;  instead of protecting their phone, they allowed a total stranger to keep it, even though the phone was not password-protected and even though they knew how to obtain the phone back from Vo with reasonable effort.

In *United States v. Lopez-Cruz*, 730 F.3d 803 (9th Cir. 2013), law enforcement asked the defendant about phones in the car he was driving. *Id.* at 805.  The defendant said that the phones were a friend's. *Id.* at 805-06.  The court concluded that the defendant could not be found to have abandoned his reasonable expectation of privacy in the phones because the phones were in the defendant's possession and were being used by him at the time that law enforcement encountered him. *Id.* at 808-09.  As the court further explained, "[T]he fact that the agent sought [the defendant's] permission before searching the phones suggests that the agent did not believe that [the defendant] had abandoned his privacy interest in the phones, and contradicts the government's position that his actions exhibited a clear abandonment of them." *Id.* at 809.  Unlike the *Lopez-Cruz* defendant, Johnson and Sparks were not in possession of and were not using the

41

seized phone when it was seized or when it was searched—and they had not been in possession of it and they had not used it for at least 23 days.

*United States v. Garzon*, 119 F.3d 1446 (10th Cir. 1997), is likewise inapposite. In *Garzon*, the defendant was on a bus to Chicago that had a brief layover in Denver. *Id.* at 1450. The bus driver advised the patrons that they could leave their belongings on the bus during the layover. *Id.* at 1448. When the bus arrived in Denver, however, law enforcement instructed the bus riders to remove all of their property from the bus and to carry it past a narcotics-trained dog. *Id.* The defendant removed one backpack but left two other bags on the bus. *Id.* In concluding that the defendant had not abandoned the two bags, the court noted that the defendant was scheduled to reboard the bus that held the bags in question, and the only act that the district court relied on to find abandonment was the defendant's failure to obey what the circuit court concluded was law enforcement's unlawful order to remove items from the bus and "parade them past a drug-sniffing dog." *Id.* at 1450. Johnson and Sparks's case does not involve any unlawful orders—or any orders of any type, for that matter—by law enforcement that precipitated the acts of abandonment. Instead, Johnson and Sparks decided completely on their own to cease their pursuit of their phone and to obtain a replacement.

Finally, in *United States v. Most*, 876 F.2d 191 (D. C. Cir. 1989), the defendant asked a store clerk to hold his bag for him while he was leaving the store.  *Id.* at 192.  The court held that this simple act did not constitute abandonment, noting that the store clerk testified that the defendant asked three or four times before he left for the store clerk to hold onto the bag for him.  *Id.* at 197.  As the court explained, the defendant "entrusted his belongings to the professional supervision of the cashiers with the clear understanding that they would protect the property from intrusion by the public." *Id.*

But unlike the defendant in *Most*, Johnson and Sparks did not entrust their phone to Vo.  Rather, Vo found it.  Though Vo originally agreed to return the phone, when she failed to do so at the appointed time and place, she never agreed to safeguard Defendants' phone for them.  And unlike in *Most*, where the search occurred within a short period of the defendant's entrusting of the package to the store clerk, the search of Defendants' phone did not occur for 23 days after Vo failed to meet Johnson and Sparks.  That's a long time to leave an unprotected cell phone with a complete stranger when reasonable efforts were available to recover the phone.  In short, we do not agree that our decision today conflicts with other Circuits' case law.

We emphasize that Defendants had alternatives available to them to recover the phone with reasonable effort, but they instead made a deliberate decision not to

43

do so.  On this record, we are left with a definite and firm conviction that the district court erred in finding that Sparks and Johnson maintained even a minimal possessory interest in the seized phone after they abandoned their efforts to recover the phone from Vo and obtained a replacement phone.[17]  For this reason, Defendants lack standing to challenge the delay between June 7, when, at the latest, they made an affirmative decision to stop pursuing the phone, despite knowing how to obtain it with relatively little effort, and June 27, when law enforcement obtained the search warrant for the phone.

**3.**

During the three-day period from June 4, when the FMPD seized the phone, and June 7, when, at the latest, Johnson and Sparks abandoned any possessory interest they may have had in the seized phone, the phone spent one day in transport to the Cape Coral Police Department, and Officer Enterline—the only Task Force member with access to the Cape Coral Police Department evidence room—was then assigned as the case agent as she was boarding a flight out of

---

[17] We do not address the situation where information is simultaneously stored on a cell phone or other computer and the Cloud.  The record contains no evidence that any of the searched information was stored on the Cloud.  To the contrary, all of the images and videos in this case were stored on local media—specifically, on the cell phone at issue and on another cell phone recovered in Johnson's home, as well as on four USB drives and a Micro SD card.  *See*, *e.g.*, Testimony of Sparks, ECF No. 62 at 224 (emphasis added) (agreeing that she "expect[ed] that the ***photographs and the information that [she] placed on the hard drive of [the recovered] phone*** . . . would be entitled to privacy . . . .").

44

town.  Under these circumstances, the three-day delay was not unreasonable and did not violate Johnson's and Sparks's Fourth Amendment rights.

**4.**

Johnson and Sparks also argue that the FMPD should have informed them that it had possession of their phone so that they could have asserted their possessory interests in it.  But Widner, Vo, and the FMPD had no information beyond the first names of the owners.

Widner entered the police station with the phone and immediately told Coleman, the first government agent that he encountered, that he believed the phone contained inappropriate images of children.  At that point, had law enforcement searched the phone more broadly than Widner, law enforcement would have risked violating the Fourth Amendment.  *See O'Bryant*, 775 F.2d at 1534 (explaining that under *South Dakota v. Opperman*, 428 U.S. 364, 96 S. Ct. 3092 (1976), police are lawfully allowed to search property within their custody so long as that search is consistent with the police caretaking function and is not merely a pretext for concealing an investigatory police motive).[18]  Moreover, the record clearly demonstrates that, as a matter of policy, the FMPD does not search

---

[18] Widner did not exchange any texts or speak on the phone with the purported owners of the phone.  Although it appears Vo might have, the district court found that the extent to which Vo had viewed the phone's contents was unclear.  Consequently, the police could not search any part of the phone that Widner had not shown them without risking running afoul of *Opperman*.

technological devices it receives for indicia of ownership.[19]  Quite simply, nothing required (and nothing may have allowed) the FMPD to look for information related to the ownership of the cell phone so that the owners could assert their possessory interests in it.   And even if the FMPD were required to have searched for ownership information, (which, to be clear, it was not), the FMPD's failure to do so does not shed light on Johnson's or Sparks's intent to subsequently relinquish their interests in the phone voluntarily.

In making the determination that the district court's denial of Johnson's and Sparks's motions to suppress should be affirmed, we remain mindful that

> "the exclusionary rule . . . is a prudential doctrine created by th[e Supreme] Court to compel respect for the constitutional guaranty" of the Fourth Amendment. *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419, 2426, 180 L.Ed.2d 285 (2011) (citations and internal quotation marks omitted).  Its "sole purpose . . . is to deter future Fourth Amendment violations," and it "is not a personal constitutional right" or "designed to redress the injury" already suffered.  *Id.* (internal quotation marks omitted).  In short, "[w]here suppression fails to yield appreciable deterrence, exclusion is clearly unwarranted."  *Id.* at 2426-27 (internal quotation marks omitted).

*Laist*, 702 F.3d at 615 (alterations in original).

Our decision here does nothing to undermine the diligence requirement's incentive for law enforcement to act quickly to secure a warrant.  Johnson's and

---

[19] The FMPD does look through items such as purses and wallets, which usually contain government-issued identification, in an effort to return the property to its likely owner.

Sparks's actions and inactions demonstrating that they voluntarily relinquished their possessory interests in the phone were completely beyond the FMPD's or Agent Enterline's ability to control.  For instance, had Johnson or Sparks ever returned to the Walmart to try to recover the phone when Vo did not return it at the appointed time and place, evidence would exist demonstrating that Johnson and Sparks had not abandoned their possessory interests.  The delay in obtaining the search warrant that allegedly intruded on those interests could then be balanced "against the importance of the governmental interests alleged to justify the intrusion." *Place*, 462 U.S. at 703, 103 S. Ct. at 2642.  Even after today's decision, then, "officers who [delay in obtaining a warrant] will recognize that whatever evidence they discover as a . . . result of the [delay] may be suppressed." *Segura*, 468 U.S. at 812, 104 S. Ct. at 3389.

Additionally, we cannot overlook the fact that the cell phone was lost, it was recovered by private citizens, and neither the FMPD nor Agent Enterline were aware of the phone's rightful owners before the search warrant was executed. Again, the purpose of the diligence requirement is to ensure that property thought to contain contraband can be returned promptly to its owners to limit the intrusion on their possessory interests, should contraband not be found.  *See Mitchell*, 565 at F.3d at 1352.  But here—where Johnson and Sparks took no action to retrieve their phone despite knowing who had found it and where she worked—acting diligently

47

would not have effectuated the diligence requirement's purpose. On the other hand, when law enforcement is aware of or should be aware of who the owners of seized property are, they must act diligently so the purpose underlying the rule will be effectuated. Under the circumstances of this case, excluding the evidence would not even "minimally advance Fourth Amendment interests." *Jacobsen*, 466 U.S. at 125, 104 S. Ct. at 1663.

For these reasons, we hold that because Johnson and Sparks abandoned their possessory interests in the cell phone, they lack standing to assert that any delay beyond June 7 in obtaining a warrant intruded upon their constitutional rights.[20] *See Colbert*, 474 F.2d at 176 (collecting cases to support the proposition that "one has no standing to complain of a search or seizure of property he has voluntarily abandoned"). As a result, the district court did not commit reversible error in denying the motions to suppress.

## IV.

Johnson also appeals the imposition of his 600-month prison sentence, arguing that it violates the Fifth and Sixth Amendments.

---

[20] Our standing analysis on this issue does not affect the determination that Johnson and Sparks have standing to assert that evidence should be suppressed because (1) the FMPD's search exceeded the scope of the private search. At the time the challenged FMPD and private searches occurred, Johnson and Sparks had not yet abandoned the cell phone, so they still maintained a reasonable expectation of privacy in it. Even if we employed the traditional balancing test to analyze whether the delay between seizure of the phone and procurement of the warrant was reasonable, the result would be the same. With no possessory interest to weigh on Johnson's and Sparks's side of the scale, any delay before obtaining a search warrant was inherently reasonable.

Section 2251(e) of Title 18 ordinarily provides for a statutory minimum sentence of fifteen years' imprisonment and a maximum of thirty years for a violation of 18 U.S.C. § 2251.  If the person being sentenced was previously convicted under the chapter, however, § 2251(e) provides for a minimum sentence of twenty-five years' imprisonment and a maximum of fifty years.  Johnson received the enhanced penalty of fifty years, based upon a 2003 conviction for possession and transporting of child pornography.

He argues that the imposition of this enhancement violated his Fifth Amendment right to due process because the specific conviction relied upon for the enhancement was not alleged in the indictment, so, he asserts, he was not afforded proper notice of the elements of the offense necessary to sustain such a sentence.  Additionally, Johnson challenges the enhancement on Sixth Amendment grounds, arguing that because he did not admit to the prior conviction in the plea agreement, the fact of the prior conviction relied upon to increase both the statutory minimum and maximum was not proven beyond a reasonable doubt.

In making these arguments, Johnson principally relies on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000).  In *Apprendi*, the Supreme Court held that facts that expose a defendant to an increase of the statutory maximum penalty constitute elements of the crime and cannot merely be found by a preponderance of the evidence by the judge.  *Id*. at 490, 120 S. Ct. at 2362-63.

Instead, any such fact must be submitted to the jury and proven beyond a reasonable doubt. *See id.* Significantly, though, the Court excluded prior convictions that might increase statutory maximums from having to be submitted to a jury and proven beyond a reasonable doubt. *Id.*

Johnson concedes that *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219 (1998), forecloses his argument. In that case, the Court held that a prior conviction need not be alleged in the indictment to trigger an enhanced statutory maximum. *Id.* at 229, 118 S. Ct. at 1223. Although the Supreme Court hinted in dicta in *Apprendi* that *Almendarez-Torres* might have been incorrectly decided, *Apprendi*, 530 U.S. at 489, 120 S. Ct. at 2362, we have repeatedly noted that we are bound by *Almendarez-Torres* until the Supreme Court explicitly overrules it. *E.g., United States v. Beckles*, 565 F. 3d 832, 846 (11th Cir. 2009).

Nevertheless, Johnson attempts to distinguish his case from *Almendarez-Torres*. He argues that in *Almendarez-Torres* the defendant admitted the existence of the prior convictions during his plea colloquy, so the Court had to address only the defendant's Fifth Amendment rights to indictment, due process, and notice and had no reason to discuss his Sixth Amendment right to a jury trial. Here, however, Johnson contends that he never admitted to the fact of his 2003 conviction or that it was a qualifying predicate at his plea colloquy and that the government, therefore, was required to prove it beyond a reasonable doubt.

50

Although the plea agreement did not specifically mention the 2003 conviction, it did explicitly state that Johnson was pleading guilty to 18 U.S.C. § 2251(e) and that the minimum was twenty-five years and the maximum was fifty years' imprisonment. By the plain language of the statute, this minimum and maximum is applicable only to the extent that a defendant has a prior conviction under the same chapter. And significantly, Johnson does not contest the factual accuracy of the conviction; that is, he has not contended that he was not in fact previously convicted under the chapter. This proves fatal to his appeal. *See Apprendi*, 530 U.S. at 488, 120 S. Ct. at 2362 (noting that the procedural safeguards related to the "fact" of conviction, and the failure to challenge the "fact" of conviction mitigate any Sixth Amendment concerns that might otherwise be implicated by allowing a judge to determine a "fact" that increases the punishment beyond the statutory maximum). Accordingly, the district court did not err by applying the statutory enhancement when sentencing Johnson.

## V.

For the foregoing reasons, the judgments and sentences of the district court are **AFFIRMED**.

51

MARTIN, Circuit Judge, dissenting:

I agree with the careful ruling of the Majority that the search of Alan Johnson and Jennifer Sparks's cell phone by Detective-Sergeant O'Reilly exceeded the scope of the private search done by Linda Vo and David Widner. I write separately, however, because I do not believe that Mr. Johnson and Ms. Sparks abandoned their cell phone. And if the phone was not abandoned, then the twenty-three-day delay in getting a search warrant for the phone was long enough to render its seizure unreasonable under the Fourth Amendment. Based on this, I would suppress law enforcement's search of the phone to the extent it went beyond the private search. Also, the officers searched the Johnson/Sparks home based on what they found during what I view as their unreasonable seizure of the phone, so I would suppress that search as well.

Both Mr. Johnson and Ms. Sparks pleaded guilty, but conditioned those pleas on their ability to raise the Fourth Amendment claims the panel addresses here. While my ruling would not suppress all of the evidence used to convict them, I believe it would mean they are prevailing parties, as that term is used in Federal Rule of Criminal Procedure 11. Mr. Johnson and Ms. Sparks would therefore have the right, under Rule 11, to withdraw their guilty pleas. That being the case, I respectfully dissent to the judgment entered by the Majority.

52

## I.

I do not read our precedent to support the Majority's conclusion that Mr. Johnson and Ms. Sparks abandoned their possessory interest in their cell phone after three days of looking for it.[1]  This is not the typical case of abandonment, in which a person's "only conceivable purpose . . . was to rid himself of the [item] with its incriminating contents."  United States v. Williams, 569 F.2d 823, 826 (5th Cir. 1978).  To my knowledge, this court has not previously deemed property "abandoned" for Fourth Amendment purposes when it was accidentally lost and reasonable efforts were made to find it.

Further, Mr. Johnson and Ms. Sparks's actions do not suggest that they "abandoned" their phone.  It does not seem correct for the Majority to say that Mr. Johnson and Ms. Sparks "took no action to retrieve their phone."  Upon realizing that they had accidentally left their cell phone at Walmart, Ms. Sparks immediately

---

[1] Our precedent requires the government to bear the burden of proving abandonment. United States v. Cofield, 272 F.3d 1303, 1306 (11th Cir. 2001) (per curiam).  Though the government mentioned the issue of abandonment in the early stages of this case in the District Court, it never asked for or got a ruling from the trial court about whether Mr. Johnson and Ms. Sparks had abandoned their cell phone.  The government in essence abandoned its abandonment argument.  The District Court made no findings related to abandonment in denying the defendants' motions to suppress.  It did not mention the word.  The government, in turn, did not argue abandonment on appeal.  Indeed, the word "abandon" never appears in the brief the government filed here.  Because the government failed to meet its burden of proof on the abandonment issue, and we have no factual findings about abandonment from the District Court, we should not now rely on our own findings on that subject to rule in favor of the government on appeal.

53

returned to the store in an attempt to find and claim it.  The store had not located the cell phone yet, so this first effort proved unsuccessful.

Ms. Sparks then sent a text message identifying herself and Mr. Johnson as the owners of the phone to anyone who might have found it, and urgently requested its return.  Linda Vo, a Walmart employee, had found the phone and responded to Ms. Sparks's text message.  Ms. Sparks then spoke with Ms. Vo on the phone.  The two arranged for Ms. Vo to keep the phone until Ms. Sparks could pick it up from Ms. Vo's workplace.

But Ms. Sparks's second trip to get the phone also proved unsuccessful.  Ms. Vo gave the phone to Mr. Widner, who in turn gave it to the Fort Myers Police Department, who then gave it to the Cape Coral Police Department.  Still, Mr. Johnson and Ms. Sparks remained undeterred in their efforts to retrieve their cell phone.  Even while Mr. Widner was turning the phone over to the police, Mr. Johnson and Ms. Sparks continued to call and send text messages to the phone in an attempt to reclaim it.  These text messages "would automatically pop up" even as the police were examining the phone, stating that "we need the phone back" and even "giving information as to where they could meet to get the phone back."

At the Fort Myers police station, Detective-Sergeant O'Reilly then turned the phone off and submitted it to evidence, blocking further efforts by Mr. Johnson and Ms. Sparks to successfully communicate with their cell phone.  He then drove

the phone over to the Cape Coral Police Department.  The entire time, Mr. Johnson

and Ms. Sparks were under the impression that they were going to get the phone

back from Ms. Vo at Walmart and had no knowledge the phone was located at a

police station.

The Majority seems to suggest that Mr. Johnson and Ms. Sparks should have

done even more to retrieve their phone in order to avoid a finding of abandonment.

For example, the Majority characterizes Mr. Johnson and Ms. Sparks as having

"voluntarily relinquished" their possessory interest in the phone.  This seems to be

based on the Majority's belief that they "took no action to retrieve their phone"

from Ms. Vo after their initial attempts in the first three days, "despite knowing

who had found it and where she worked."[2]

But in considering this question, it is important to note that Ms. Vo never

testified in this case.  We can only surmise based on Mr. Widner's testimony what

Mr. Johnson and Ms. Sparks possibly did to get their phone after it was turned over

---

[2] In order to arrive at its finding that Mr. Johnson and Ms. Sparks abandoned their phone, the Majority makes findings, for the first time on appeal, about what Mr. Johnson and Ms. Sparks knew and what motivated them to take the actions they may or may not have taken.  For example, the Majority says that Mr. Johnson and Ms. Sparks "chose not to file a report with the police complaining about Vo's failure to give them back their phone, though they knew where Vo could be found," that they "did not ask anyone at Walmart for assistance in obtaining the phone's return from Vo," and that "no evidence exists that [Mr.] Johnson or [Ms.] Sparks ever even sent another text message to the phone after June 4, 2012, in an attempt to retrieve it."  The District Court made no factual findings one way or the other about these issues.  It is the job of Courts of Appeals to review findings of fact for clear error.  See United States v. Ramos, 12 F.3d 1019, 1022 (11th Cir. 1994); Fed. R. Civ. P. 52(a)(6).  We do not properly engage in fact finding in the first instance.  See S.S. Silberblatt, Inc. v. U.S. for Use & Benefit of Lambert Corp., 353 F.2d 545, 550 (5th Cir. 1965) ("It is not the province of this court to determine the essential facts on which the judgment is based; that is the proper function of the trial court.").

to the police.  And it is simply a mistake to think that we can know the full extent of Mr. Johnson and Ms. Sparks's efforts to retrieve their cell phone based on Mr. Widner's testimony.  He repeatedly acknowledged he did not know the full extent of Ms. Vo's interactions with them.[3]

Courts must distinguish between the everyday use of the term "abandonment" and its use in a context that may result in the loss of Fourth Amendment protections.  Here, Mr. Johnson and Ms. Sparks ended their efforts to recover their lost cell phone only after several days of active searching.  Although this might colloquially be referred to as "abandonment," it is not nearly what is necessary to show abandonment so as to deprive someone of their Fourth Amendment protections.

For Fourth Amendment purposes, "the critical inquiry is whether the person prejudiced by the search . . . voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search."  United States v. Ramos, 12 F.3d 1019, 1022 (11th Cir. 1994) (quotation & emphasis omitted).  "Whether abandonment occurred is a question of intent

---

[3] For example, the following exchanges were had during Mr. Widner's testimony: Q: "And you don't know how many [photos] that your wife looked at?"  A: "No, I do not."  Q: "You don't know one way or the other whether [Ms. Vo sent a text to the phone]?"  A: "Correct."  Q: "So you don't know whether your wife gave [the Fort Myers Police Department] the details of the communication that she had had with the individual that called with respect to the phone?"  A. "No."  Q: "And have you spoken to your wife further about what the nature of that conversation was?"  A. "No, sir, not really."

56

which may be inferred from acts, words and other objective facts." Id. at 1022–23 (quotation omitted). Our precedent teaches us to consider case-specific facts in determining whether abandonment has occurred. Id. at 1025.

There are many ways to affirmatively abandon something. For example, a person may abandon something by words. See, e.g., United States v. Pirolli, 673 F.2d 1200, 1204 (11th Cir. 1982) (finding abandonment where ownership of items was explicitly disclaimed by a defendant who said "I never saw them before in my life"). He may abandon it by deed. See, e.g., United States v. Brown, 473 F.2d 952, 954 (5th Cir. 1973) (finding abandonment where the defendant had buried a suitcase in a chicken coop in an open field). He may abandon it by a combination of the two. See, e.g., United States v. Colbert, 474 F.2d 174, 177 (5th Cir. 1973) (en banc) (finding abandonment where two individuals, in response to police questioning, verbally disclaimed any interest in briefcases and began to walk away from them). He may abandon it by saying nothing under circumstances in which any reasonable owner in the same position would speak up to claim possession. See, e.g., United States v. Cofield, 272 F.3d 1303, 1307 (11th Cir. 2001) (per curiam) (finding abandonment of bags where a person set them down and did not claim ownership after the police made a loud announcement asking if the bags belonged to someone nearby). He may abandon it by a failing to act after promising to reclaim the property. See, e.g., United States v. Lehder-Rivas, 955

57

F.2d 1510, 1521–22 (11th Cir. 1992) (finding abandonment where an owner left a suitcase with an acquaintance for over a year after explicitly promising and failing to retrieve it within three months).  He may abandon property by giving it away with the intent to accept its return only at his discretion.  See, e.g., United States v. McKennon, 814 F.2d 1539, 1546 (11th Cir. 1987) (per curiam) (finding abandonment of a suitcase containing cocaine where the defendant gave the luggage to another person to carry and admitted that he did not intend to retake possession unless the carrier reached the final destination without incident).

But a person may not abandon property for Fourth Amendment purposes by mere loss, carelessness, or accident, where he has made reasonable efforts to reclaim the property.  See, e.g., Ramos, 12 F.3d at 1026 (11th Cir. 1994) (finding no abandonment where the defendant left a briefcase in a temporarily leased condominium a few hours after the scheduled checkout and telephoned the condominium office the next day to seek the briefcase's return).  In light of their repeated efforts to reclaim it, Mr. Johnson and Ms. Sparks demonstrated no intent to abandon the cell phone.[4]  The fact that they could have conceivably done more

---

[4] To my knowledge, no other Circuit has ever found abandonment for Fourth Amendment purposes where property was lost and the owner made reasonable efforts to recover it.  The Seventh Circuit explained abandonment precedent from federal Courts of Appeals nicely:

> There are three general types of abandonment cases, which are based on the[] two [main] indicia of abandonment[, explicit denials of ownership and physical relinquishment of the property].  The first type is characterized by the presence of a fleeing defendant who relinquishes an object to make his flight easier or because discarding the item might make it easier for him to later claim that he never

58

is simply not sufficient, in my view, to constitute abandonment under the Fourth

Amendment.

I also understand the Majority to equate Mr. Johnson and Ms. Sparks's

purchase of a new phone with abandonment of the old.  But we must be mindful of

the status cell phones now have as property.  They function as "cameras, video

players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions,

maps, or newspapers."  Riley v. California, __ U.S. __, __, 134 S. Ct. 2473, 2489

(2014).  They have "immense storage capacity" and allow people to "collect[] in

one place many distinct types of information—an address, a note, a prescription, a

bank statement, a video."  Id.  When Mr. Johnson and Ms. Sparks lost their cell

phone, they lost troves of information necessary for navigating modern life.

Buying a replacement phone allowed them to begin reaccumulating this

----

> possessed it. . . .  The second type of case is closely related to the first, for in so-called "garbage cases" the defendant places material in or near a refuse receptacle that is readily accessible to the public, and in which he usually places other discarded materials. . . .  In the third type of case, the defendant is usually caught red-handed with or near a container of contraband, whereupon he denies that the container or its contents are his.

United States v. Basinski, 226 F.3d 829, 837 (7th Cir. 2000) (citations omitted).  This case does not look like any of these situations, where a finding of abandonment might be appropriate.

Other Circuits have found in cases like this one, where there was no verbal denial of an interest in the property or clear physical relinquishment of it (such as by throwing the property away, unconditionally giving it to another person, or dropping it and running away from it), that a person had not abandoned the property.  See, e.g., United States v. Infante-Ruiz, 13 F.3d 498, 501–02 (1st Cir. 1994); United States v. Scrivner, 680 F.2d 1099, 1100–01 (5th Cir. 1982); United States v. Basinski, 226 F.3d 829, 837–38 (7th Cir. 2000); United States v. James, 353 F.3d 606, 616 (8th Cir. 2003); United States v. Lopez-Cruz, 730 F.3d 803, 808–09 (9th Cir. 2013); United States v. Garzon, 119 F.3d 1446, 1450 (10th Cir. 1997); United States v. Most, 876 F.2d 191, 196–97 (D.C. Cir. 1989).

59

information.  But getting a new phone does not mean they abandoned their interest in the unique information contained in the lost phone.

In my view, Mr. Johnson and Ms. Sparks took all the reasonable steps a responsible owner of lost property would have taken to recover it.  That being the case, they did not "abandon" their lost cell phone after three days.  I would hold that Mr. Johnson and Ms. Sparks maintained a possessory interest in the phone during the entire twenty-three-day seizure.

## II.

If indeed Mr. Johnson and Ms. Sparks did not abandon their cell phone, we are left to decide whether the twenty-three-day delay in seeking a search warrant for the phone rendered the seizure of the phone—and the resulting search of their home—unreasonable under the Fourth Amendment.  No one disputes that police seized the cell phone without a warrant on June 4 and held it until June 27.  On that date, Agent Enterline got a search warrant.

The reasonableness of a delay in getting a search warrant is "determined in light of all the facts and circumstances, and on a case-by-case basis," balancing the interests of the government and the private citizens.  United States v. Mitchell, 565 F.3d 1347, 1351 (11th Cir. 2009) (per curiam) (quotations omitted).  The reasonableness of the delay is decided upon review of several factors, including: the significance of the interference with the person's possessory interest; the length

60

of the delay; whether the person consented to the seizure; and the government's legitimate interest in holding the property as evidence. United States v. Laist, 702 F.3d 608, 613–14 (11th Cir. 2012).

In United States v. Mitchell, 565 F.3d 1347 (11th Cir. 2009) (per curiam), this Court held that an interference with an individual's possessory interest in his computer was especially significant because computers are "relied upon heavily for personal and business use" and may "store personal letters, e-mails, financial information, passwords, family photos, and countless other items of a personal nature." Id. at 1351. This principle, of course, applies to modern cell phones. See Riley, 134 S. Ct. at 2489 ("The term 'cell phone' is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone."). I know of no basis for disputing that people like Mr. Johnson and Ms. Sparks have a strong possessory interest in their cell phones.

In United States v. Laist, 702 F.3d 608 (11th Cir. 2012), this court held that two factors might diminish a person's significant possessory interest: (1) the possessor is given the opportunity to (and actually does) remove anything he wants from the item before it is confiscated; or (2) the possessor admits to the presence of and actually shows the contraband on the device to government officials. Id. at 616. Neither of these diminishing factors is present here. Mr. Johnson and Ms.

61

Sparks lost their phone, and were never given any opportunity to remove any information from it before it was seized. Nor did they make any admission to the Cape Coral Police Department that the phone contained contraband. The officers who possessed the phone had not actually seen the contraband. During the period of delay in getting the search warrant, Mr. Johnson and Ms. Sparks continued to have a strong possessory interest in their cell phone that we must weigh heavily in deciding whether the delay was reasonable.

The length of the delay—twenty-three days—also weighs against finding it was reasonable. In Mitchell, we concluded that a similar twenty-one-day delay was unreasonable. Mitchell, 565 F.3d at 1353. In Laist, although we found a twenty-five-day delay reasonable based on facts not present here, we cautioned that such a long delay was "far from ideal." Laist, 702 F.3d at 617. We deemed the delay in Laist justifiable because the government officials began preparing the warrant "on the very day" they received notice that a search warrant was necessary. Id. at 618. Also noteworthy, the warrant in Laist contained "extensive quantities of non-boilerplate information" that had been "drafted originally for th[at] warrant application." Id.

I see no similar justification for the delay here. Agent Enterline certainly did not start working on the warrant on the day she got the cell phone. Neither did she begin preparing it while she was back in town from June 8–10, or when she was

62

again in town from June 16–20.  Also, the warrant she produced contained little original information.  A mere half-page was anything other than boilerplate, and the warrant took less than half a day to prepare.  Finally, Agent Enterline's justification for the delay—that she had been out of town to take part in three separate trainings and had been told the search warrant was "no big deal, look into it when you get back"—was precisely the type of justification for delay this court rejected in Mitchell.  See Mitchell, 565 F.3d at 1352–53.

While a person's consent to the seizure of his property may justify some delay in procuring a search warrant, Laist, 702 F.3d at 614, there was clearly no consent here.  Mr. Johnson and Ms. Sparks did not even know the police had their phone, and the police made no effort to secure their consent to the seizure.

Finally we must consider "the government's legitimate interest in holding the property as evidence."  Laist, 702 F.3d at 614.  We know that Agent Enterline had not seen images of child pornography on the cell phone.  That makes this case different from Laist.  See id. at 616.  This case is also not like Mitchell because the defendants had not told Agent Enterline there was contraband on the phone.  See Mitchell, 565 F.3d at 1349 (finding even an admission by the defendant insufficient to bolster the government's interest because "until an agent examines the [item's] contents, he cannot be certain that it actually contains child pornography," id. at 1351).  Agent Enterline had been told only that the phone

63

"may or may not contain child pornography." This remark, in my view, is not enough to create a government interest in keeping custody of the phone sufficient to justify the twenty-three-day delay in seeking a search warrant.

I would hold that the government's twenty-three-day delay rendered the seizure of the cell phone, and the resulting search of Mr. Johnson and Ms. Sparks's home, unreasonable under the Fourth Amendment.

### III.

As I said at the outset, Mr. Johnson and Ms. Sparks entered a guilty plea in this case, conditioned on their reservation of their right to appeal the Fourth Amendment issues discussed extensively here. Under Federal Rule of Criminal Procedure 11, a defendant who "prevails on appeal" may withdraw a conditional plea. Fed. R. Crim. P. 11(a)(2). The holding I propose would, as I understand it, make Mr. Johnson and Ms. Sparks prevailing parties. This would in turn allow them to withdraw their guilty pleas.

I respectfully dissent to the judgment of the Majority.