[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-10346
_____

D.C. Docket No. 8:12-cr-00205-EAK-MAP-4


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHARLIE L. GREEN,
NATHANIEL HARRIS,
JERRY W. GREEN, JR.,
NAPOLEON HARRIS,
COREY DEONTA HARRIS,
DEONTE JAMAL MARTIN,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(November 25, 2020)

Before WILSON and GRANT, Circuit Judges, and HINKLE,[*] District Judge.

WILSON, Circuit Judge:

We vacate our August 11, 2020 opinion, *United States v. Green, et.al.*, 969 F.3d 1194 (11th Cir. 2020) and substitute the following in its place.

This appeal arises out of the convictions of Charlie Green, Napoleon Harris, Nathaniel Harris, Jerry Green, Corey Harris,[1] and Deonte Martin—a group of brothers, relatives, and friends who operated a drug-trafficking organization in Bradenton, Florida.  Members of the group used and carried guns; kidnapped, beat, and murdered people; and tampered with witnesses of their crimes.  Most of the appellants were convicted of participating in a racketeering conspiracy under the Racketeer Influenced and Corrupt Organizations (RICO) Act and a drug-trafficking conspiracy, as well as gun crimes and other crimes.  The appellants raise various challenges related to their convictions, their sentences, and various decisions the district court made throughout the pre-trial and trial process.

Two issues warrant special attention: whether RICO conspiracy qualifies as a crime of violence under 18 U.S.C. § 924(c)—an issue of first impression in the

---

[*] Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida, sitting by designation.

[1] To avoid confusion, we refer to the appellants with the last names "Green" and "Harris" by their first names.

2

Eleventh Circuit—and whether Corey's sentence is procedurally and substantively reasonable. Because we hold that RICO conspiracy does not qualify as a crime of violence under § 924(c), we vacate the appellants' § 924(c) convictions and sentences, and we remand to the district court for resentencing. And because we determine that Corey's sentence was procedurally unreasonable, we vacate his sentence and remand for resentencing. We affirm as to the remaining issues.

BACKGROUND

Napoleon, Nathaniel, and Charlie are brothers. Together with friends and relatives such as Corey, Jerry, and Martin, they made up a "crew" that, starting in at least the mid-2000s, sold crack cocaine, powder cocaine, marijuana, heroin, and other drugs throughout Bradenton, Florida. The appellants and others prepared, packaged, and distributed drugs out of various trap houses, and members of the crew sold drugs for and with each other, relying on an intertwined network of sellers. To establish the crew's dominance, further its drug-trafficking operation, eliminate competition, and avoid prosecution, members of the crew shared and used guns, vehicles, and cell phones; fled from law enforcement; and participated in a myriad of violent acts, including kidnappings, attempted murders, and murders spanning from April 2007 to August 2013.

The appellants were indicted for 28 counts of RICO conspiracy, conspiracy to distribute controlled substances, using a firearm during and in relation to various

3

crimes of violence, and other related drug and firearm offenses.  Following a trial, a jury convicted each defendant on various counts.  This appeal followed.

## DISCUSSION

### I.      RICO Conspiracy as a "Crime of Violence"

Napoleon, Nathaniel, Charlie, Jerry, and Martin were convicted of various § 924(c) counts for using, carrying, and discharging a firearm during and in relation to the RICO conspiracy charged in Count One.  They challenge their convictions and the accompanying sentences under § 924(j), claiming that RICO conspiracy is not a "crime of violence" under § 924.  Section 924(c)(3) defines a "crime of violence" as a felonious offense:

> (A) [that] has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).  We typically refer to § 924(c)(3)(A) as the elements clause and to § 924(c)(3)(B) as the residual clause.  The Supreme Court recently invalidated the residual clause as unconstitutionally vague.  *See United States v. Davis*,  588 U.S. __, 139 S. Ct. 2319, 2323–24, 2336 (2019).  Therefore, we must determine whether RICO conspiracy qualifies as a crime of violence under the elements clause.

4

"We apply the categorical approach when determining whether an offense constitutes a 'crime of violence' under the elements clause," meaning "we look to whether the statutory elements of the predicate offense necessarily require, at a minimum, the threatened or attempted use of force." *Brown v. United States*, 942 F.3d 1069, 1075 (11th Cir. 2019) (per curiam). In *Brown*, this court evaluated whether conspiracy to commit Hobbs Act robbery is a crime of violence under § 924(c)(3)'s elements clause. *Id.* at 1075–76. We noted, "The elements of conspiracy center on a defendant's *agreement* to commit a crime and do not require the government to prove the elements of the underlying substantive crime itself." *Id.* at 1075. Applying the categorial approach to the elements of a conspiracy to commit Hobbs Act robbery,[2] we concluded that conspiracy to commit Hobbs Act robbery does not qualify as a crime of violence under § 924(c)(3)'s elements clause. *Id.* We reasoned:

> Neither an agreement to commit a crime nor a defendant's knowledge of the conspiratorial goal necessitates the existence of a threat or attempt to use force. The same goes for the final element—a defendant's voluntary participation that furthers the goal of committing Hobbs Act robbery—because a defendant's voluntary participation may manifest itself in any one of countless non-violent ways.

*Id.*

---

[2] The elements of a conspiracy to commit Hobbs Act robbery include: "(1) two or more people, including the defendant, agreed to commit Hobbs Act robbery; (2) the defendant knew of the conspiratorial goal; and (3) the defendant voluntarily participated in furthering that goal." *Brown*, 942 F.3d at 1075.

RICO conspiracy is virtually indistinguishable from a conspiracy to commit Hobbs Act robbery. "To establish a RICO conspiracy violation under 18 U.S.C. § 1962(d), the government must prove that the defendants objectively manifested, through words or actions, *an agreement* to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes." *United States v. Starrett*, 55 F.3d 1525, 1543 (11th Cir. 1995) (per curiam) (emphasis added) (internal quotation mark omitted). RICO conspiracy requires neither proof of the commission of an overt act nor proof of an agreement to commit individual predicate acts. *Id.*; *see United States v. Pepe*, 747 F.2d 632, 659 (11th Cir. 1984). A RICO conspiracy thus differs from a regular conspiracy because it "may encompass a greater variety of conduct." *Pepe*, 747 F.2d at 659. So as with a conspiracy to commit Hobbs Act robbery, the elements of a RICO conspiracy focus on the *agreement* to commit a crime, which does not "necessitate[] the existence of a threat or attempt to use force." *Brown*, 942 F.3d at 1075. Therefore, RICO conspiracy does not qualify as a crime of violence under § 924(c)(3).

Given the evolution of the law since the parties submitted their briefs, the government conceded at oral argument that RICO conspiracy generally does not qualify as a crime of violence under § 924(c). But the government made one last-ditch effort, arguing that the appellants were convicted of a different crime—"aggravated RICO conspiracy"—which, according to the government, does qualify

6

as a crime of violence. The argument is this: 18 U.S.C. § 1963(a), which establishes statutory maximum sentences for § 1962 offenses, adds an element to a typical § 1962(d) violation where the violation is based on a racketeering activity that carries a maximum penalty of life imprisonment. In other words, an individual commits aggravated RICO conspiracy by (1) "objectively manifest[ing], through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes" (2) "for which the maximum penalty includes life imprisonment." *Cf.* §§ 1962(d), 1963(a); *Starrett*, 55 F.3d at 1543.

Assuming without deciding that a distinct crime of aggravated RICO conspiracy exists, there is nothing in the indictment or elsewhere to indicate that these appellants were charged with and convicted of it. Neither the indictment nor the jury instructions referenced § 1963(a)—and the first time the government proposed that these appellants were charged or tried for a crime other than conventional RICO conspiracy was after the briefs were filed, in a "supplemental" authority letter. Thus, the indictment's omission of any reference to aggravated RICO conspiracy or § 1963(a) is not merely a "citation error" as contemplated by

Federal Rule of Criminal Procedure 7(c)(2).  The government cannot salvage the appellants' § 924(c) convictions by reimagining the charged crimes.[3]


## II.    Corey's Sentence

Corey challenges his 120-year sentence as both procedurally and substantively unreasonable.  He argues that the district court procedurally erred by failing to adequately explain its five-fold upward variance from the appropriate guideline range.  Further, he contends the district judge based the sentence on clearly erroneous facts—namely, that Corey extended the overall conspiracy from Bradenton into St. Petersburg and that he participated in the murder of Brenton Coleman.  He also claims his sentence is substantively unreasonable because it is unjustly disproportionate to his codefendants' sentences given his comparatively minor role in the criminal activity.

We review the reasonableness of a sentence for abuse of discretion.  *United States v. Irey*, 612 F.3d 1160, 1186, 1188–89 (11th Cir. 2010) (en banc).  "To be upheld on appeal, a sentence must be both procedurally and substantively reasonable."  *United States v. Rodriguez*, 628 F.3d 1258, 1264 (11th Cir. 2010).  We determine first whether the district court committed a "significant procedural

---

[3] Because the appellants were neither charged with nor convicted of aggravated RICO conspiracy, we need not decide today whether it exists or whether it qualifies as a crime of violence.

8

error," and second whether the sentence was "substantively reasonable under the totality of the circumstances." *United States v. Overstreet*, 713 F.3d 627, 636 (11th Cir. 2013). A sentence can be procedurally unreasonable if the district court improperly calculated the guideline range, failed to consider the 18 U.S.C. § 3553(a) factors, failed to adequately explain the sentence, or selected a sentence based on clearly erroneous facts. *See Gall v. United States*, 552 U.S. 38, 51 (2007).

When pronouncing a sentence, the sentencing court need only set forth enough to demonstrate that it "considered the parties' arguments and ha[d] a reasoned basis for exercising [its] . . . decisionmaking authority." *United States v. Carpenter*, 803 F.3d 1224, 1232 (11th Cir. 2015). If the district court decides "after serious consideration that a variance is in order," it should provide compelling and complete justifications sufficient "to allow meaningful appellate review." *United States v. Shaw*, 560 F.3d 1230, 1238 (11th Cir. 2009) (internal quotation marks omitted).

A district court's factual findings at sentencing—including its findings about conduct for which the defendant was acquitted—need only be supported by a preponderance of the evidence. *See United States v. Faust*, 456 F.3d 1342, 1347–48 (11th Cir. 2006). We review such findings for clear error, overturning a finding only if a review of the evidence leaves us with "a definite and firm conviction a

mistake has been made." *United States v. Dimitrovski*, 782 F.3d 622, 628 (11th

Cir. 2015). "Although review for clear error is deferential, a finding of fact must

be supported by substantial evidence." *United States v. Robertson*, 493 F.3d 1322,

1330 (11th Cir. 2007). The district court may base factual findings on evidence

presented at trial, undisputed statements in the presentence report (PSR), or

evidence presented at the sentencing hearing, and it may make reasonable

inferences from the evidence. *See United States v. Chavez*, 584 F.3d 1354, 1367

(11th Cir. 2009); *United States v. Polar*, 369 F.3d 1248, 1255 (11th Cir. 2004).

Corey pled guilty to three counts of distribution of cocaine base and was

convicted by the jury for one count of conspiracy to distribute and possess with

intent to distribute less than 50 kilograms of marijuana and less than 28 grams of

cocaine base. He was acquitted of the RICO conspiracy count and the § 924(c)

count regarding Coleman's murder.[4] His PSR identified his total offense level as

40 and his criminal history category as IV, and it calculated his guideline range as

360 months to 1,440 months.[5]

At his sentencing hearing, Corey informed the court that he had reached an

agreement with the government and probation to modify the guideline range in the

---

[4] Corey, Napoleon, Charlie, and Martin were charged § 924(c) violations regarding Coleman's death. Only Martin was convicted.

[5] Corey's total offense level and criminal history category would ordinarily put the guideline range at 360 months to life, but because the statutory maximum for each of Corey's counts is 30 years, his statutory maximum sentence is 1,440 months. *See* 21 U.S.C. § 841(b)(1)(C); U.S.S.G. § 5G1.2(d).

PSR. He explained that if the court accepted the modified range, it would resolve all but one of his objections to the PSR—namely, his objection to the PSR's references to his involvement in the Coleman murder despite his acquittal on that charge. The court read the revisions into the record, noting that the total offense level would be reduced to 34 and the resulting guideline range would be reduced to 210 to 262 months. The court confirmed that the agreement resolved all but one of the objections to the PSR and gave Corey the opportunity to argue his outstanding objection regarding the Coleman murder. The court overruled the objection, adopted the guideline applications in the PSR, and then read the modification of the total offense level and sentencing guideline into the record. Corey asked for a downward variance from the agreed-upon guideline range, and the government asked for a sentence at the high end of the 210-to-262-month range.

The district court sentenced Corey to 1,440 months' (120 years) imprisonment, consisting of 360-month terms to run consecutively for each of his four counts of conviction. In support of the sentence, the court found that Corey had extended the conspiracy to St. Petersburg and participated in the Coleman murder. Regarding the Coleman murder, the court stated:

> So I think the hold of that family in Bradenton was still strong with you, so strong that even though you left your cell phones in St. Petersburg, I think the testimony showed you came across that bridge, the Sunshine Skyway, and you didn't come over for an evening of entertainment. You came over for a purpose, and I think there is enough evidence in the case—and I find specifically by a preponderance of the evidence

11

that there is enough evidence in that case to support the sentence I'm about to give you.

In its Statement of Reasons, the district court indicated that it had determined the guideline range to be 210 to 262 months, and it had imposed a sentence above the guideline range. It also identified Corey's role in the Coleman murder as an aggravating factor supporting the variance.

Four days later, the district court conducted a supplemental sentencing proceeding. The court stated that it had treated the parties' agreement as a joint motion for a downward variance and rejected it. It explained it had brought the parties back so Corey could address his other objections to the PSR—which had not been discussed during the initial sentencing hearing—to prevent any waiver issue on appeal. Corey responded that he thought the court had accepted the agreed guideline range calculation but had chosen to impose an upward variance. The government and probation indicated they had the same impression. Given the court's apparent recharacterization of the parties' agreement, Corey's counsel sought clarification *four times* regarding the guideline range on which the court relied in imposing the sentence. The court never directly answered the question; it merely postulated, "If that's what the record reflects to you, then it reflects that," while still suggesting that it treated the agreement as a request for a downward variance. Corey never discussed his other objections to the PSR.

12

By failing to clarify the applicable guideline range, the district court inadequately explained Corey's sentence. At the initial sentencing hearing, the district court appeared to accept the agreed-upon guideline range of 210 to 262 months before upwardly departing to impose the statutory maximum sentence of 1,440 months—a nearly 550% increase from the high end of the guideline range. The Statement of Reasons reflected as much. But at the supplemental sentencing hearing several days later, the court suggested it had treated the parties' agreement as a motion for a downward variance that the court had denied. By never clarifying the guideline range it had relied upon despite Corey's repeated requests for clarification, the district court left a conflicting, unresolved record as to Corey's applicable guideline range.

Further, although the applicable guideline range remained unclear, the district court's finding that Corey participated in the Coleman murder was clear— and clearly erroneous. The district court found that Corey left his cell phones in St. Petersburg when he crossed the Sunshine Skyway bridge to participate in the Coleman murder on August 1, 2013, but the evidence demonstrates this would have been impossible. Toll booth records showed that Corey traveled south on the Sunshine Skyway bridge towards Manatee County at approximately 12:30 p.m. Cell phone tower records for the two cell phones attributed to Corey showed that both cell numbers utilized cell towers in Manatee County during the early

13

afternoon, between 1:56 p.m. and 2:23 p.m.  The cell numbers then began utilizing cell towers back in Pinellas County again about 2:54 p.m., including the use of a cell tower in St. Petersburg at about 8:06 p.m.—within moments of Coleman's murder about 25 miles away.

If the cell phones remained at home while Corey traveled south over the Sunshine Skyway at 12:30 p.m., they could not have been pinging cell towers in Manatee County between 1:56 p.m. and 2:23 p.m., and then in Pinellas County from 2:54 p.m. to 8:06 p.m.  In light of this stipulated cell phone evidence, the evidence in the record does not substantially support the district court's finding. We are thus left with a firm conviction that the district court made a mistake by finding that Corey left his cell phones at home and drove to Bradenton to commit the Coleman murder.

Because the district court failed to adequately explain Corey's sentence and relied on a clearly erroneous fact, it imposed a procedurally unreasonable sentence.

### III.    All Remaining Issues

#### A. Suppression Issues

It goes without saying that the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  Some of the appellants claim their Fourth Amendment rights were violated, challenging the district court's denial of their

motions to suppress.  Nathaniel moved to suppress evidence gathered from lawfully seized cell phones that law enforcement failed to return to him for four years.  Napoleon, Jerry, and Martin moved to suppress cell phone records containing historical cell-site and real-time tracking data that law enforcement acquired without a warrant but pursuant to state-court orders granted under Chapter 934 of the Florida Statutes, and consistent with the federal Stored Communications Act (SCA), 18 U.S.C. § 2703(d).  When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and the district court's application of the law to fact de novo.  *United States v. Ramirez*, 476 F.3d 1231, 1235 (11th Cir. 2007).  We will address each suppression theory in turn.

i.     Nathaniel's Cell Phones

Fourth Amendment protection does not extend to abandoned property. *United States v. Sparks*, 806 F.3d 1323, 1341–42 (11th Cir. 2015), *overruled in part on other grounds by United States v. Ross*, No. 18-11679, slip op. at 23 (11th Cir. June 24, 2020) (en banc).  We take an objective, common-sense approach to assessing abandonment, focusing on whether the prior possessor "voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question" in light of his "statements, acts, and other facts."  *Id.* at 1342.

Nathaniel argues that law enforcement violated his Fourth Amendment rights by keeping his cell phone—which was lawfully seized incident to an arrest for driving with a suspended license in 2010—for four years without returning it to him. So, in his eyes, any evidence found on the phone after the federal government took it and executed a search warrant on it should have been suppressed as fruits of an unreasonable seizure.

The district court found, however, that Nathaniel had abandoned his interest in the phone. The record supports that finding. About 48 hours after Nathaniel's arrest, law enforcement authorized release of the phone. Nothing in the record supports Nathaniel's unsworn assertions that he sought to recover the phone before the federal government seized it under a valid search warrant. *See Travaglio v. Am. Express Co.*, 735 F.3d 1266, 1270 (11th Cir. 2013) ("Statements by counsel in briefs are not evidence."). In other words, there is no evidence suggesting that Nathaniel did or said anything over the course of four years to maintain his interest in the phone. Thus, common sense indicates that Nathaniel "voluntarily discarded, left behind, or otherwise relinquished his interest" in the phone. *See Sparks*, 806 F.3d at 1342. Because Nathaniel abandoned his interest in the phone, there was no Fourth Amendment violation, and his motion to suppress was properly denied.

      ii.    Napoleon's, Jerry's, and Martin's Cell Phone Data

16

A warrantless search is "per se unreasonable under the Fourth Amendment." *United States v. Steed*, 548 F.3d 961, 967 (11th Cir. 2008) (per curiam). The Supreme Court recently held in *Carpenter v. United States* that the acquisition of historical cell-site records is a search under the Fourth Amendment, so the government must obtain a warrant to access such records. 585 U.S. __, 138 S. Ct. 2206, 2217–21 (2018).

But evidence obtained in violation of the Fourth Amendment is not always subject to exclusion. *See Davis v. United States*, 564 U.S. 229, 236 (2011). The exclusionary rule is "a prudential doctrine created by the Supreme Court to compel respect for the constitutional guaranty" and "deter future Fourth Amendment violations." *United States v. Smith*, 741 F.3d 1211, 1218 (11th Cir. 2013) (alterations accepted) (internal quotation marks omitted) (quoting *Davis*, 564 U.S. at 236). In other words, "[s]uppression is not an automatic consequence of a Fourth Amendment violation," but rather a "last resort, justified *only* where the deterrence benefits of suppression outweigh the substantial social costs of ignoring the reliable, trustworthy evidence bearing on guilt or innocence." *Id.* (alteration accepted) (internal quotation marks omitted); *see Herring v. United States*, 555 U.S. 135, 137 (2009). It follows that when officers act with "an objectively reasonable good-faith belief that their conduct is lawful"—i.e., by acting in reasonable reliance on a warrant, statute, or court order—the exclusionary rule

17

does not apply because there is little, if any, deterrence benefit in such circumstances. *See Davis*, 564 U.S. at 238–39 (internal quotation marks omitted); *United States v. Leon*, 468 U.S. 897, 918–22 (1984); *United States v. Taylor*, 935 F.3d 1279, 1289–90 (11th Cir. 2019), *petition for cert. filed*, (U.S. Feb. 6, 2020) (No. 19-7581); *United States v. Joyner*, 899 F.3d 1199, 1204 (11th Cir. 2018) (per curiam) (applying the good-faith exception to the exclusionary rule where the government obtained cell-site records pursuant to a court order issued under the SCA pre-*Carpenter*).

Napoleon, Jerry, and Martin argue that because acquisitions of historical cell-site data and real-time tracking data are searches under the Fourth Amendment, the government's warrantless apprehension of such information related to their cell numbers violated the Fourth Amendment and warranted exclusion. The government responds that the defendants lack standing to seek suppression of the data because they never established ownership or possession of the relevant cell phones, and regardless, the good-faith exception to the exclusionary rule applies.

Assuming without deciding that the appellants have Fourth Amendment standing,[6] the good-faith exception to the exclusionary rule applies here.  The

---

[6] Fourth Amendment standing is prudential, not jurisdictional; therefore, we need not address it if we can affirm on the merits.  *See Byrd v. United States*, 584 U.S. __, 138 S. Ct. 1518, 1530 (2018) ("The concept of standing in Fourth Amendment cases can be a useful

18

officers reasonably relied on 2013 state-court orders issued under a Florida statute, and consistent with the SCA, to acquire the defendants' historical cell-site data and real-time tracking data. As to historical cell-site data, there was no reason for officers to believe the state-court orders were invalid under the Fourth Amendment. At the time—five years before *Carpenter* was decided—there was no reason for the officers to believe there was a reasonable expectation of privacy to such records such that they would need a warrant supported by probable cause to acquire them. Indeed, our court held in 2015 that no expectation of privacy to such records existed. *See United States v. Davis*, 785 F.3d 498, 513 (11th Cir. 2015) (en banc), *abrogated by Carpenter*, 138 S. Ct. at 2217–19, 2221.

And as to real-time tracking data, the officers likewise reasonably relied on the state-court orders because there was no reason for the officers to believe they were invalid. The question of whether acquiring such information constitutes a search was unanswered in 2013 and remains unanswered today. *See id.* (noting that *United States v. Jones*, 565 U.S. 400 (2012) held that a GPS tracker placed on a private vehicle was a search because the tracker was inserted on private property, not necessarily because real-time tracking intrudes on a reasonable expectation of

---

shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search; but it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits."); *see also Ross*, slip op. at 14–15 (bringing the Eleventh Circuit in line with the Supreme Court's precedent in *Byrd*).

privacy); *Carpenter*, 138 S. Ct. at 2220 ("We do not express a view on matters not before us: real-time [cell-site location information] or 'tower dumps' . . . ."). So again, there was no reason for officers to believe in 2013 that there was a reasonable expectation of privacy to those records such that they would need a warrant to acquire them. Because the officers reasonably relied on the state-court orders, little to no deterrent effect would have flowed from excluding the historical cell-site and real-time tracking evidence.[7] The motions to suppress were properly denied.

## B. Peremptory Challenge

Martin argues the district court violated his jury-trial right by denying his request to exercise a peremptory strike. We review the procedure adopted by the trial court to regulate the parties' exercise of peremptory challenges for abuse of discretion. *United States v. Isom*, 88 F.3d 920, 923 (11th Cir. 1996) (per curiam). A trial court has "wide discretion in supervising the selection of jurors and regulating the exercise of peremptory challenges." *United States v. Bryant*, 671 F.2d 450, 455 (11th Cir. 1982). The trial court can require defendants to jointly exercise their peremptory challenges. *See id.*; Fed. R. Crim. P. 24(b).

---

[7] The appellants' suggestion that the officers acted in bad faith by hiding their desire to track the appellants' movements is not well taken. The applications plainly referenced an intent to use the requested records to locate the appellants.

At voir dire, the parties had agreed the defendants would jointly exercise their peremptory challenges through Napoleon's attorney. After the court had empaneled the jury and moved to selecting alternates, Martin's counsel attempted to strike a juror seated on the regular panel. The court denied the requested strike. The court did not abuse its discretion in doing so, as Martin's requested strike was made in contravention to the agreed voir dire procedure and after Napoleon's counsel had accepted the panel on the defendants' behalf. *See Bryant*, 671 F.2d at 455 (finding no basis for defendant's claim of prejudice in joint peremptory challenge procedure where "[c]ounsel were informed prior to the beginning of voir dire of the procedure to be used and voiced no objection").

## C. Evidence Admissions and Witness Testimony

The appellants also raise numerous issues concerning the admission of certain evidence and witness testimony: (1) whether the district court abused its discretion by admitting evidence of Jerry's other alleged crimes and bad acts; (2) whether the district court abused its discretion by admitting evidence that Jerry had referred to himself on social media as a "two-time murder winner"; (3) whether the district court abused its discretion by admitting into evidence statements that Irma Gonzalez and Lashawn White overheard; (4) whether the district court plainly erred by preventing Martin from impeaching government witness Dequayl Williams about the witness's supposed participation in dog fighting; (5) whether

21

the district court abused its discretion by denying Napoleon's motion for mistrial after the court permitted the introduction of Corey's guilty plea during trial; and (6) whether the district court plainly erred in failing to declare a mistrial following a prosecutor's allegedly improper remark about Martin during closing argument.

We review evidentiary rulings and the denial of a motion for mistrial for abuse of discretion. *United States v. Barsoum*, 763 F.3d 1321, 1338, 1340 (11th Cir. 2014). Where the appealing party failed to object at trial, we review for plain error. *United States v. Charles*, 722 F.3d 1319, 1322 (11th Cir. 2013); *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003). We review erroneous evidentiary rulings for harmless error. *Allstate Ins. Co. v. Swann*, 27 F.3d 1539, 1543 (11th Cir. 1994).

Having reviewed the parties' briefs and the record, we affirm the district judge's rulings. Any errors were harmless in light of the overwhelming evidence supporting the jury's verdicts.[8]

## D. Cumulative Error

Martin argues that the court's denial of the use of available preemptory challenges during voir dire, the denial of the opportunity to cross-examine Williams, the admission of White's hearsay testimony, and the prejudicial effect of

---

[8] As discussed below, the district court abused its discretion by admitting the hearsay testimony regarding street rumors White overheard, but this error was harmless. *See infra* n.9.

22

the government's introduction of false testimony and improper remark during closing argument, taken together, had "a more debilitating effect" when juxtaposed against the dearth of evidence supporting his convictions. He thus claims that cumulative error by the district court requires reversal of his convictions.

Under the cumulative-error doctrine, the court "will reverse a conviction where an aggregation of non-reversible errors yields a denial of the constitutional right to a fair trial." *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014). We assess cumulative-error claims by "first considering the validity of each claim individually, and then examining any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). But if overwhelming evidence supports the jury's verdict such that any errors had no "substantial influence" on the verdict, then even multiple errors can be rendered harmless. *See United States v. Baker*, 432 F.3d 1189, 1223–25 (11th Cir. 2005), *abrogated on other grounds by Davis v. Washington*, 547 U.S. 813, 822 (2006).

Here, Martin established no more than one error,[9] which does not amount to "the aggregation of 'many errors' that may require a reversal where the individual

---

[9] The only error we identify is the admission of White's testimony concerning street rumors she had heard that Martin and Eric Neri murdered Coleman. The government and the district court treated the testimony as admissible under Federal Rule of Evidence 801(d)(2)(E)

errors do not." *See United States v. Ochoa*, 941 F.3d 1074, 1106 (11th Cir. 2019).

Therefore, there was no cumulative error.

### E. Sufficiency of the Evidence

Several appellants also challenge the sufficiency of the evidence supporting

their convictions. Nathaniel, Jerry, and Napoleon challenge their convictions for

RICO conspiracy. Nathaniel, Jerry, and Corey challenge their convictions for drug

conspiracy. Jerry and Charlie challenge their § 924(c) convictions. Martin

challenges his felon-in-possession conviction as well as the jury's special verdict

findings that he conspired to murder Coleman and did so. Jerry challenges the

jury's special verdict finding that he murdered Carlos Jurado. Charlie also

challenges the jury's special verdict findings that he kidnapped "T.S.," murdered

Joseph Evans and Ceola Lazier, conspired to murder Coleman, and was

responsible for more than 100 kilograms of marijuana. And Nathaniel challenges

the reliability of the witness testimony supporting his convictions.

We review de novo a denial of a motion for judgment of acquittal on

sufficiency of the evidence grounds, viewing the evidence in the light most

favorable to the government and resolving all reasonable inferences and credibility

---

based on the fact that White overheard the statements from co-conspirators, but the record demonstrates that White repeatedly clarified that she never overheard any of the co-conspirators attribute Coleman's murder to Martin and Neri—she had only heard that through street rumors. This error was harmless, though, given the substantial evidence supporting the jury's findings regarding Martin's involvement in the Coleman murder.

determinations in the government's favor. *United States v. Capers*, 708 F.3d 1286, 1296 (11th Cir. 2013). The jury's verdict must be affirmed unless no reasonable trier of fact could have reached a conclusion of guilt beyond a reasonable doubt. *See United States v. Foster*, 878 F.3d 1297, 1304 (11th Cir. 2018). We review the denial of a Federal Rule of Criminal Procedure 33 motion for new trial based on a jury verdict against the weight of the evidence for abuse of discretion. *See United States v. Hunt*, 526 F.3d 739, 744 n.1 (11th Cir. 2008).

The challenges to the § 924(c) convictions are moot given the vacatur of those convictions. Having reviewed the parties' briefs and the record, we affirm the remaining convictions and findings as they are supported by more-than-sufficient evidence. To the extent the appellants' arguments challenge the credibility of various witnesses, credibility determinations are exclusively within the province of the jury. *See United States v. Hernandez*, 743 F.3d 812, 814 (11th Cir. 2014) (per curiam). We may not revisit such determinations unless a witness's testimony is incredible as a matter of law, *United States v. Thompson*, 422 F.3d 1285, 1291–92 (11th Cir. 2005), and we have found no such testimony here.

## F. Inconsistent Verdicts

Jerry, Charlie, and Napoleon assert that they are entitled to relief because of inconsistencies in their verdicts. Jerry argues that his conviction for the § 924(c) crime associated with Lazier's death is inconsistent with his acquittal for Lazier's

25

murder.  Charlie argues that the jury's special verdict finding that he conspired to murder Coleman is inconsistent with his acquittals for Coleman's murder and the associated § 924(c) charge.  Napoleon argues that the jury's special verdict finding that he kidnapped Calvin Barnes and his conviction for the § 924(c) violation associated with Demetrius Cunningham's murder are inconsistent with his acquittal for Cunningham's murder.  He also argues that his conviction for knowingly possessing ammunition for use in the attempted murders of "C.P." and "C.S." is inconsistent with his acquittals for those attempted murders and their associated § 924(c) charges.

We review de novo whether inconsistent verdicts render a conviction improper.  *United States v. Mitchell*, 146 F.3d 1338, 1342 (11th Cir. 1998).  That being said, inconsistent jury verdicts are generally insulated from review because "a jury may reach conflicting verdicts through mistake, compromise, or lenity," but "it is impossible to determine whose ox has been gored."  *See United States v. Powell*, 469 U.S. 57, 68–69 (1984); *United States v. Mitchell*, 146 F.3d 1338, 1344 (11th Cir. 1998) (internal quotation marks omitted).  Thus, "as long as the guilty verdict is supported by sufficient evidence, it must stand, even in the face of an inconsistent verdict on another count."  *Mitchell*, 146 F.3d at 1345.

Jerry and Napoleon's challenges to their § 924(c) convictions are moot given the vacatur of those convictions.  But even assuming the other challenged guilty

verdicts are inconsistent, they must stand because—having reviewed the parties' briefs and the record—we determine that sufficient evidence supports them.

## CONCLUSION

For these reasons, we vacate Charlie Green's, Napoleon Harris's, Nathaniel Harris's, Jerry Green's, and Deonte Martin's § 924(c) convictions predicated on the RICO conspiracy charged in Count 1 (Counts 4–6, 9–10, 17–19, and 25), and on that basis, their sentences on all counts.[10]  *See, e.g.*, *United States v. Fowler*, 749 F.3d 1010, 1015–16 (11th Cir. 2014).  We also vacate Corey Harris's sentence as procedurally unreasonable.  We affirm on all other grounds, and remand to the district court for further proceedings consistent with this opinion.

---

[10] Charlie and Napoleon raise issues with their sentences, but because we vacate their sentences, those issues are moot.

27