[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14091

_____

AARON COLEMAN,

Plaintiff-Appellee,

*versus*

HILLSBOROUGH COUNTY,
official capacity, et al.,

Defendants,

JOHN RICCARDO,
in their individual capacities,
JAMES VALENTINO,
in their individual capacities,
WILLIAM FAIR,

2                    Opinion of the Court                    20-14091

in their individual capacities,
STEPHEN ALEXANDER GADY,
in their individual capacities,

Defendant-Appellant.

————————————

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:18-cv-01678-MSS-AAS

————————————

Before JORDAN, NEWSOM, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

An anonymous complaint to the Hillsborough County Animal Services Department resulted in a search warrant for Aaron Coleman's house. That search led to Coleman's arrest and trial on charges of aggravated animal cruelty, battery on an officer, and resisting arrest. After a jury acquitted Coleman, he sued the officers who arrested him. This appeal presents the narrow question of whether those officers are immune from suit under Florida law. The answer is that they are.

## I.  BACKGROUND AND PROCEDURAL HISTORY

This case began in February 2014 when Coleman noticed that his dog's front paw was missing a nail.[1] Jennifer Williams lived with Coleman, and she took the dog, who was named JJ, to a veterinarian.  The veterinarian initially suspected that JJ had an infection but eventually diagnosed him with bone cancer.  After consulting several veterinarians, Coleman put JJ on "a palliative care program" and planned to "keep JJ comfortable until his quality of life had diminished to the point where euthanasia was appropriate."

While JJ was on that palliative care program, the Hillsborough County Animal Services Department received an anonymous complaint that JJ was not receiving medical treatment.  The complaint included photos of JJ's injured paw and alleged that his injury had been caused by a gunshot.  Animal Services sent out one of its investigators, Paris Dunkley, to follow up.

When investigator Dunkley arrived at Coleman's home on July 8, 2014, she spoke with Williams.  Dunkley described the animal cruelty complaint to Williams who explained that the open sore was "a cancerous tumor that ruptured," not a gunshot wound.

---

[1] The "facts" at the summary judgment stage are what a reasonable jury could find from the evidence viewed in the light most favorable to Coleman, who was the non-moving party opposing summary judgment; they "are not necessarily the true, historical facts." See Cantu v. City of Dothan, 974 F.3d 1217, 1222 (11th Cir. 2020).

Dunkley issued Williams an "Official Notice" that gave her a week to take JJ back to a veterinarian for further care.

After Dunkley issued that notice and returned to her work van, Coleman came home. He and Dunkley spoke while she was sitting inside her van. It was raining, and when Dunkley ended the conversation, she rolled up her window, trapping the tip of Coleman's umbrella. Coleman tapped on the driver's side window of the van for several minutes, prompting Dunkley to call the police.

Two officers arrived in response to her call. After she discussed the situation with those officers, Dunkley shortened the amount of time she had given Coleman and Williams to take JJ to the veterinarian from a week to one day. She and the officers left.

Two days later, on July 10, 2014, Dunkley obtained a search warrant for Coleman's residence, saying in her supporting affidavit that she believed "animals" were being kept there "without veterinarian care" and "in a cruel and inhumane manner." No one was home later that day when approximately 15 Tampa Police Department officers accompanied Dunkley to execute the search warrant. Dunkley called Williams and explained that she was there with police officers to search the house, and Williams came home to let the officers in. Coleman's daughter called him and told him what was happening.

Coleman's relationship with the Tampa police was already strained when the officers served the search warrant. One Tampa police officer described Coleman as an activist, and Coleman

testified that he plans to become a lawyer so that he can defend those "who have been entrapped" in what he calls "the criminal business system." He believes that the officers concocted the search warrant as part of a plan to kill or capture him.

About six months before they executed the search warrant at Coleman's house on July 10, 2014, Tampa police had arrested his son. James Valentino, one of the defendant officers in this case, suffered a broken ankle while chasing Coleman's son on that occasion. The charges against Coleman's son were later dismissed

In 2014, the year that they had arrested the younger Coleman, and the year they executed the search warrant at Coleman's house in July, Tampa police officers had showed up at his house on 16 days between February and May. Most of those visits were coded as either "Juvenile Home Detention Check," "Juvenile Curfew Check," or "Juvenile Curfew Law (Under 16yo)."

There is no evidence that any of the officers involved in this case were among the ones who made any of those previous house calls in 2014. Coleman testified that he had not had "any type of contact or encounter" with any of the defendant officers until they came to search his house on July 10, 2014. He had seen Valentino's name on his son's arrest paperwork before then but had never met or spoken to the officer. Valentino testified that he did not know Coleman before the day of the search and related events, and there is no evidence that Valentino knew about Coleman and the police chase that resulted in the officer's broken ankle.

Coleman arrived home while the search of his home was in progress on July 10. Valentino was there assisting with the search. He had never before served a search warrant for animal cruelty, and his shift was almost over when he decided to help the other officers conduct the search. He testified that his squad often serves search warrants and that he has assisted with search warrants "in the double digits" of times during his three years with the squad.

As he approached his home, Coleman stopped at the gated fence surrounding his house and spoke to Valentino, who told him that the officers were involved in "an active investigation." Coleman, who is hearing impaired and was not wearing his hearing aid, told Valentino that he did not "hear very well" and asked him: "Did you say this was an active investigation?" Instead of answering, Valentino asked Coleman his name and whether he lived at the house, and Coleman confirmed that he did.

Valentino also asked Coleman if he was "refusing to leave the yard," and when Coleman said that he was not, Valentino asked him to step outside of the gate. Coleman agreed, but before he could comply, Officers Stephen Gady, John Riccardo, and Valentino placed him under arrest.

During the arrest, Valentino grabbed Coleman's left arm and Gady used the "hammerlock escort position" to secure Coleman's right arm. The officers handcuffed Coleman and escorted him to a police cruiser where Riccardo "pushed and pressed [Coleman] against [the] police car." Valentino and Gady flanked Coleman, and Gady asked Coleman if he "had anything that might cut,

poke, [or] stick him." Coleman answered that he didn't know, but added that he had just returned from community college where he had used pencils to take a math test.

Gady kicked one of Coleman's feet "at least two times" to spread Coleman's legs, and Valentino placed his foot against Coleman's other foot. While the two officers secured Coleman's feet "like you would chock a wheel," Gady searched Coleman. The officers then put him in the back of their car, where he remained for "nearly two hours."

While Coleman was in the police car, Officer William Fair arrived at the scene to transport Coleman to the police station. He took over supervision of Coleman and removed him from the first police car, searched him again, and put him in a different police car. Even after Coleman was handcuffed in the back of the second police car, Fair searched him "multiple times." Fair testified that he will search arrestees more than once if they are "moving around or [if] it look[s] like they might [be] concealing something," and that Coleman was "moving around a lot" in the back of the patrol car.

The parties stipulated that Fair caused Coleman "temporary testicular pain" while searching him. Fair testified that he performed "a thorough search" of Coleman. When conducting "a thorough search," Fair puts his "hand up in the genital area" because people sometimes hide "handcuff keys, weapons, other contraband, [and] drugs" in their underwear. Fair testified that he doesn't "recall ever" squeezing Coleman's or anyone's genitals during a search, and that his search of Coleman "was no different than

8                    Opinion of the Court                    20-14091

any other search that [he'd] done, which does not include grabbing the genitals."

As we've mentioned, Coleman was charged with aggravated cruelty to animals, battery on a law enforcement officer, and resisting an officer without violence.[2] A jury acquitted him of all charges.

After being acquitted, Coleman filed the lawsuit that led to this appeal, naming as defendants Hillsborough County, the City of Tampa, Dunkley, Fair, Gady, Riccardo, and Valentino. His complaint alleged federal claims against Dunkley, the County, and the City, but those claims are not at issue in this interlocutory appeal.[3] The claims that are at issue are the state law tort claims that Coleman asserted against Fair, Gady, Riccardo, and Valentino in their individual capacities.

In the district court the officers asserted entitlement to Florida sovereign immunity on Coleman's state law claims: false arrest and false imprisonment against Gady, Riccardo, and Valentino; and

---

[2] Coleman was also charged with possession of a "reptile of concern" based on Florida Fish and Wildlife's seizure of an African python from his house, but the State later dismissed that charge.

[3] Coleman asserted several state tort claims against Dunkley. The district court granted Dunkley summary judgment in part but denied her summary judgment on Coleman's federal malicious prosecution claim and state law false imprisonment claim. Dunkley filed an appeal but later filed a motion to voluntarily dismiss it, and because that motion was granted, she is no longer a party to this appeal.

battery against all four officers.  The court denied the officers summary judgment on those claims, determining that there was a question involving disputed facts about whether they had probable cause to arrest Coleman, and ruling that if they didn't have probable cause they were not entitled to the protection of Florida's sovereign immunity statute, Florida Statute § 768.28(9)(a).  The officers contend that the district court erred in that ruling.

## II. DISCUSSION

Coleman has moved to dismiss this appeal for lack of appellate jurisdiction because the district court's order denying summary judgment on sovereign immunity grounds is not a final order.  "Generally, an order denying a motion for summary judgment is not an appealable final order." *Schmelz v. Monroe Cnty.*, 954 F.2d 1540, 1542 (11th Cir. 1992); *see also* 28 U.S.C. § 1291 (providing that the federal courts of appeals "have jurisdiction of appeals from all *final* decisions of the district courts of the United States") (emphasis added).  But there is "a small class of interlocutory orders, referred to as 'collateral orders,' . . . which are immediately appealable without regard to the posture of the underlying case." *Schmelz*, 954 F.2d at 1542.

Under the collateral order doctrine, an order denying summary judgement based on state sovereign immunity is immediately appealable "if state law defines the immunity at issue to provide immunity from suit rather than just a defense to liability." *Parker v. Am. Traffic Sols., Inc.*, 835 F.3d 1363, 1367 (11th Cir. 2016).  "In Florida, sovereign immunity is both an immunity from liability

and an immunity from suit." *Fla. Hwy. Patrol v. Jackson*, 288 So. 3d 1179, 1185 (Fla. 2020). As a result, an order denying state sovereign immunity under Fla. Stat. § 768.28(9)(a) is immediately appealable. *See Parker*, 835 F.3d at 1367; *see also Keck v. Eminisor*, 104 So. 3d 359, 366 (Fla. 2012) (explaining that under § 768.28(9)(a) the denial of summary judgment based on individual immunity must be immediately appealable because if it were not, "that statutory protection [would] become[] essentially meaningless for the individual defendant"). Because the district court's order denied the officers immunity under § 768.28(9)(a), it is immediately appealable.

Having jurisdiction to decide the officers' appeal, we turn to the remaining issue: whether the district court erred when it denied officers Gady, Riccardo, Valentino, and Fair summary judgment on Coleman's state law claims against them. The officers contend that they are entitled to summary judgment because, as a matter of law, they are immune from suit under Fla. Stat. § 768.28(9)(a). We review *de novo* state sovereign immunity issues, "viewing all of the facts in the record in the light most favorable to the non-movant." *Green v. Graham*, 906 F.3d 955, 959 (11th Cir. 2018) (quotation marks omitted). Coleman's the non-movant.

Florida law provides that:

An officer, employee, or agent of the state or of any of its subdivisions may not be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act,

event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Fla. Stat. § 768.28(9)(a).

It is undisputed that the officers were acting within the scope of their employment when they arrested Coleman. The sole question is "whether a reasonable trier of fact could possibly conclude" that the officers' conduct "fall[s] within the exceptions" to immunity defined in § 768.28(9)(a). *Furtado v. Yun Chung Law*, 51 So. 3d 1269, 1277 (Fla. 4th DCA 2011). Those exceptions to immunity apply when an officer acted: (1) "in bad faith," (2) "with malicious purpose," or (3) "in a manner exhibiting wanton and willful disregard of human rights [or] safety." *Id.* at 1276–77; Fla. Stat. § 768.28(9)(a). "Florida Statutes do not define [those] phrases" as they are used in § 768.28(9)(a). *Peterson v. Pollack*, 290 So. 3d 102, 109 (Fla. 4th DCA 2020). So "we must examine how courts have interpreted those phrases under Florida law" before we can decide whether the exceptions apply. *Id.*

The first two exceptions, "in bad faith" and "with malicious purpose," are "synonymous with each other under Florida law." *See id.* at 111. Another way to put it is that Florida courts have equated bad faith with "the actual malice standard." *Id.* at 109 (quotation marks omitted); *see also Parker v. Fla. Bd. of Regents ex rel. Fla. State Univ.*, 724 So. 2d 163, 167 (Fla. 1st DCA 1998)

("Although the statute does not define bad faith, under section 768.28(9)(a), bad faith has been equated with the actual malice standard.") (alteration adopted and quotation marks omitted). The "actual malice" and "malicious purpose" exceptions apply when the conduct was committed with "ill will, hatred, spite, or an evil intent." *See Peterson*, 290 So. 3d at 109 (alteration adopted); *Reed v. State*, 837 So. 2d 366, 369 (Fla. 2002) (defining actual malice as "ill will, hatred, spite, an evil intent") (quotation marks omitted); *Tomlinson v. State*, 322 So. 3d 212, 214 (Fla. 3d DCA 2021) ("[A]ctual malice means ill will, hatred, spite, an evil intent.") (quotation marks omitted). We will refer to these synonymous phrases as the actual malice exception.

The third category of conduct that will strip officers of their state sovereign immunity is "wanton and willful disregard of human rights or safety," which is "conduct that is worse than gross negligence." *Peterson*, 290 So. 3d at 109 (alteration adopted). Wanton means "with a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons or property." *Id.* at 110. Willful means "intentionally, knowingly and purposely." *Id.* Together those terms describe "conduct much more reprehensible and unacceptable than mere intentional conduct." *Id.* at 109. We will refer to this Florida sovereign immunity carve-out as the wanton and willful disregard exception.

The district court in this case disposed of the officers' Florida sovereign immunity defense to Coleman's claims in a footnote.

Relying on language from *Colonial Stores, Inc. v. Scarbrough*, 355 So. 2d 1181, 1185 (Fla. 1977), the district court concluded that "[f]or purposes of immunity under Section 768.28(9)(a), malice may be inferred from the absence of probable cause." It determined that "factual disputes as to the existence of probable cause" established a question of fact as to whether the officers acted with actual malice. That, the court concluded, "preclude[d] the entry of summary judgment based on Section 768.28(9)(a)."

We believe that misunderstands the language the Florida Supreme Court used in *Colonial Stores*, a decision that did not address sovereign immunity. 355 So. 2d at 1183. Instead, that decision addressed malice as an element of a malicious prosecution claim and held that "no presumption of probable cause arises from the filing of an information with respect to the charge upon which such action is based." *Id.* at 1185. *Colonial Stores* does not support the court's denial of summary judgment to the officers in this case because under Florida law the *legal malice* element in a malicious prosecution claim, which that case involved, is not the same as the *actual malice* exception to a sovereign immunity defense, which this case involves. *See Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1357 (Fla. 1994) ("In an action for malicious prosecution it is not necessary for a plaintiff to prove actual malice; legal malice is sufficient and may be inferred from, among other things, a lack of probable cause . . . .").

Legal malice requires only "proof of an intentional act performed without legal justification or excuse" and "does not require

proof of evil intent or motive." *Reed*, 837 So. 2d at 369. But actual malice does require proof of "the subjective intent to do wrong." *Peterson*, 290 So. 3d at 109. The district court erred in this case when it applied the legal malice standard — instead of the actual malice standard — and determined that an arrest without probable cause by itself establishes that the officers acted with malice for purposes of § 768.28(9)(a). It doesn't. *See Colonial Stores*, 355 So. 2d at 1185 ("[M]alice is not legally synonymous with the absence of probable cause.").[4]

Because it applied the wrong standard, the district court didn't do what is required, which is analyze if each officer's actions created a fact question about whether he was entitled to immunity from each state law claim against him. *See* Fla. Stat. § 768.28(9)(a); *Prieto v. Malgor*, 361 F.3d 1313, 1320 (11th Cir. 2004) ("Under Florida law, an officer may not be held personally liable . . . unless the officer acted with bad faith or with malicious purpose.").

We will go ahead and resolve the immunity issues now instead of remanding the case for the district court to do so in the first

---

[4] The district court is not alone in misunderstanding the holding of *Colonial Stores*. *See N.C. ex rel. Boston v. Alonso*, No. 12-61646-CIV, 2013 WL 6564217, at *8–9 (S.D. Fla. Dec. 13, 2013) (noting that "malice may be inferred from the absence of probable cause" for purposes of § 768.28(9)(a) immunity from a state law false arrest claim) (quoting *Colonial Stores*, 355 So. 2d at 1185); *Eubanks v. Freburger*, No. 11-60714-CIV, 2012 WL 4936061, at *8 (S.D. Fla. Oct. 17, 2012) (noting the same); *Franco v. Caldwell*, No. 10-60944-CIV, 2011 WL 2262481, at *6 (S.D. Fla. June 6, 2011) (noting the same).

instance. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (explaining that it is important to resolve issues of immunity from suit "at the earliest possible stage in litigation"); *Cottrell v. Caldwell*, 85 F.3d 1480, 1487 (11th Cir. 1996) (addressing qualified immunity and explaining that where an immunity from suit is at issue, "it is imperative that [defendants] receive the benefits of that defense prior to trial"). Our review of any district court decision of the dispositive issues would be *de novo* anyway.

### A.  False Arrest and False Imprisonment

As we mentioned before, Coleman asserted false arrest and false imprisonment claims against Gady, Riccardo, and Valentino. *See supra* at 9–10.  We have held that "under Florida law false arrest and false imprisonment are different labels for the same cause of action." *Rankin v. Evans*, 133 F.3d 1425, 1430 n.5 (11th Cir. 1998) (quotation marks omitted).  The immunity issues are the same for both claims, and we will consider them together.

To survive summary judgment on his false arrest and false imprisonment claims against the individual officers, Coleman must present evidence that when they arrested him their conduct fell within either the actual malice exception or the wanton and willful disregard exception of § 768.28(9)(a).

Coleman argues that the officers acted with actual malice when they arrested him because they lacked probable cause.  But, as we have already explained, the absence of probable cause alone does not amount to actual malice.  Alternatively, Coleman argues

that the officers were motivated to arrest him without probable cause by bad faith or malicious purpose arising from an "antagonistic relationship between Coleman and Tampa police that spans two decades." In his deposition testimony, Coleman speculated that the defendant officers had "some kind of plan to . . . kill [him] or capture [him]." But he supports that speculation with little more than speculation.

Coleman points to the repeated visits to his house by other Tampa police officers. Between February 2014 and May 2014 some Tampa police officers went to his house at least 16 times. But there is no evidence that any of the four defendant officers in this case were among the officers who were at Coleman's house on any of those occasions. Coleman admitted in his testimony that until the day of his arrest he had not had "any type of contact or encounter" with any of the defendant officers.

Evidence that *some other* officers from the Tampa police department made repeated visits to Coleman's house is not, as he asserts, enough to create a genuine issue that the defendant officers were part of "some kind of plan" to kill or capture him. Speculation is no substitute for evidence. *See Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018) ("Conclusory allegations and speculation are insufficient to create a genuine issue of material fact.").

Coleman argues that defendants Valentino and Gady arrested him in retaliation for an ankle injury that Valentino suffered while chasing and trying to arrest Coleman's son six months before the two officers were involved in the arrest of Coleman in this case.

Gady testified that when he arrested Coleman, he didn't know that the person Valentino had been chasing a half year earlier was Coleman's son, and he didn't find that out "until shortly before" his deposition. Valentino testified that he did not know Coleman before the day he arrested him in this case. That testimony of Gady and Valentino was not contradicted by Coleman or anyone else.

Coleman adds that Valentino had never before served a search warrant for animal cruelty and that his shift was almost over when he decided to help the officers conducting the search. That is further evidence, Coleman argues, that Valentino was seeking "revenge relating to the ankle injury" he had suffered six months before. That is not more evidence of actual malice or willful or wanton disregard of Coleman's rights, but more speculation. See Glasscox, 903 F.3d at 1213. Valentino testified, without contradiction, that during his three years with his squad, they often served search warrants, and the number of times that he had assisted with serving warrants was "in the double digits." That was in addition to his uncontradicted testimony that he did not know Coleman until the day of the search.

On these facts, no reasonable jury could find that any of the officers acted with actual malice or with wanton and willful disregard in arresting Coleman, even if they lacked probable cause to arrest him.

In Coleman's brief, his counsel says that: "The record contains additional evidence, this brief is just that, a brief." Apparently, he would like for us to dig through the record in an effort to turn

up facts that might make his case for him.  But that is his job, not ours. *Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1373 (11th Cir. 1997) ("[W]e are not obligated to cull the record ourselves in search of facts not included in the statements of fact" in a brief.); *Adler v. Duval Cnty. Sch. Bd.*, 112 F.3d 1475, 1481 n.12 (11th Cir.1997) ("[I]t is not our place as an appellate court to second guess the litigants before us and grant them relief . . . based on facts they did not relate."); cf. *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("With a typically heavy caseload and always limited resources, a district court cannot be expected to do a petitioner's work for him.").

Gady, Valentino, and Riccardo are entitled to summary judgment under § 768.28(9)(a) on Coleman's false arrest and false imprisonment claims.

## B.  Battery

Based on their alleged conduct during his arrest, Coleman asserted battery claims against those three defendants and also against defendant Fair.  Because Coleman has presented no evidence that the officers acted with actual malice or wanton and willful disregard, they are entitled to summary judgment on those claims based on Florida sovereign immunity.  *See* Fla. Stat. § 768.28(9)(a).

For the most part, the evidence that Coleman points to as support for his battery claims is the same evidence that failed to support his false arrest and false imprisonment claims.  And it fails

to support his battery claims for the same reasons. But Coleman also points to some battery-specific evidence that he argues shows that the officers acted with actual malice or willful and wanton disregard to his safety.

Coleman testified that while the officers were arresting him, Gady kicked his right foot and secured his right arm and Valentino placed his foot against Coleman's left foot and secured his left arm. In his brief to this Court, Coleman asserts that, even though he was being "compliant," Riccardo threw him against the patrol car "hard enough to cause bruising to his ribs and sternum." The record does not support that assertion. The parties stipulated that "Riccardo, from behind, pushed and pressed [Coleman] against [the] police car because he thought [Coleman] was being uncooperative with being searched incident to [the] arrest," but they did not stipulate that Coleman suffered any injuries to his ribs or sternum, and Coleman did not testify or submit any evidence that he did either.

The parties also stipulated that Coleman "experienced temporary testicular pain" when Fair searched him. In his complaint and in his initial brief to this Court, Coleman asserts that Fair caused that pain by "forcefully squeez[ing] Coleman's genitals." Fair testified that he performed "a thorough search [of Coleman], which was no different than any other search that [he'd] done, which does not include grabbing the genitals." Coleman did not contradict that in his own testimony or with any other evidence. All he offered on the subject were allegations in his complaint and assertions in his brief. That is not enough to thwart summary

judgment. *See Greenberg v. Comm'r*, 10 F.4th 1136, 1167 (11th Cir. 2021) ("[S]tatements by counsel in their briefs are not evidence."); *accord United States v. Green*, 981 F.3d 945, 956 (11th Cir. 2020); *Sec. & Exch. Comm'n v. Quiros*, 966 F.3d 1195, 1201 (11th Cir. 2020).

Even assuming for present purposes that the officers' physical contact with Coleman during the course of his arrest was a battery, there is no genuine issue of material fact that the defendant officers acted "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a). The conduct that Coleman has alleged is not "conduct that is worse than gross negligence" or "more reprehensible and unacceptable than mere intentional conduct," and it does not establish that the officers acted "with a conscious and intentional indifference to consequences and with the knowledge that damage [was] likely to be done to persons or property." *Peterson*, 290 So. 3d at 109–11.

To show that the officers acted with malicious purpose or with willful and wanton disregard of rights or property, Florida law requires more than the evidence in this case supports. *Cf. id.* at 110 (holding that "a reasonable trier of fact could find that the [defendant] deputy's failure to confront [a school] shooter, and failure to take any other action" to protect "the students and teachers, while choosing to remain outside in a protected location to ensure his own safety, constituted" wanton and willful disregard of human rights or safety); *Thompson v. Douds*, 852 So. 2d 299, 309 (Fla. 2d

DCA 2003) (holding that a genuine issue of material fact existed about whether officers arriving in response to a call for backup were entitled to sovereign immunity defense when they had used "knee blasts" on a suspect without knowing why the original officers were struggling with him and then used their body weight to hold down the already handcuffed and bound suspect until he "went limp").

Under § 768.28(9)(a) the four defendant officers in this appeal are entitled to summary judgment on Coleman's state law claims against them.

## III. CONCLUSION

Coleman's motion to dismiss the officers' appeal for lack of jurisdiction is DENIED.

The district court's judgment is REVERSED, and this case is REMANDED with instructions for the district court to enter summary judgment, based on sovereign immunity under Fla. Stat. § 768.28(9)(a), in favor of Officers Valentino, Gady, and Riccardo on Coleman's claims of false arrest, false imprisonment, and battery and in favor of Officer Fair on Coleman's claim of battery.

**REVERSED AND REMANDED with instructions.**